C/M

FILED
IN CLERKS OFFICE
U.S. DISTRICT COURT ED. N.Y.

★ SEP 16 2004 ★

P.M. _____
TIME A.M. _____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
:
FRANKLIN REYES,                                              :
:
                              Petitioner,                    :         01-CV-7150 (ERK)(LB)
:
         -against-                                           :
:
CHARLES GREINER, SUPERINTENDENT                              :         **MEMORANDUM & ORDER**
GREEN HAVEN CORRECTIONAL FACILITY,                           :
:
                              Respondent.                    :
:
-------------------------------------------------------------X

Korman, C.J.

         In the pre-dawn hours of July 24, 1993, petitioner Franklin Reyes and two accomplices

attempted to rob a grocery store. During the attempted robbery, one of petitioner's accomplices shot

three individuals. The store's manager, George Poulopoulos, died from a gunshot wound to the

abdomen. Jesus and Fernando Jiminez, who worked for Mr. Poulopoulos, were also shot. Jesus was

shot in the abdomen and right arm, and Fernando was shot in the chest. Both men required

emergency treatment. Both survived.

         Petitioner twice confessed that he selected the grocery store to rob and drove the getaway car.

On September 22, 1994, a jury in Queens County convicted him of one count of murder in the

second degree, two counts of assault in the first degree, two counts of assault in the second degree,

seven counts of attempted robbery in the first degree, one count of criminal possession of a weapon

in the second degree, and one count of criminal possession of a weapon in the third degree. The jury

acquitted petitioner of two counts of robbery in the first degree. For the counts upon which he was

1

found guilty, petitioner was sentenced to indeterminate terms of imprisonment of 25 years to life, 5 to 15 years, 2-1/3 to 7 years, 5 to 15 years, 5 to 15 years, and 5 to 15 years, respectively.

Petitioner, who is Hispanic, took a direct appeal to the Appellate Division, alleging that (1) the prosecution's use of peremptory challenges during voir dire to exclude Hispanic prospective jurors violated the Equal Protection Clause of the Fourteenth Amendment and deprived him of his right to a fair trial; (2) the prosecution failed to establish his guilt beyond a reasonable doubt; and (3) the sentence imposed was excessive. The Appellate Division modified consecutive aspects of petitioner's sentence, but otherwise affirmed the judgment of conviction. People v. Reyes, 239 A.D.2d 524, 658 N.Y.S.2d 353 (2d Dept. 1997). Judge Bellacosa of the New York Court of Appeals denied leave to appeal. People v. Reyes, 90 N.Y.2d 909 (1997). Petitioner did not seek a writ of certiorari from the United States Supreme Court, but did file two motions for post-judgment relief in the state courts, neither of which met with any success.

On October 22, 2001, petitioner, proceeding *pro se*, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleged, inter alia, that the Equal Protection Clause was violated by the prosecutor's use of peremptory challenges to strike Hispanics from the venire. See Batson v. Kentucky, 476 U.S. 79 (1986). Petitioner also raised a panoply of other claims: (1) the proof of guilt at trial was legally insufficient; (2) the sentence imposed was excessive and violated the constitutional prohibition against cruel and unusual punishment; (3) trial counsel provided ineffective assistance in failing to challenge a certain prospective juror; (4) appellate counsel provided ineffective assistance in failing to argue that a pre-trial suppression motion was erroneously denied; and (5) there was an improper waiver of defendant's presence during jury selection conferences between counsel and the trial judge. Only petitioner's Batson claim, which has been

2

briefed by counsel appointed at my direction, has sufficient merit to warrant discussion.

A.      Juror Voir Dire

Voir dire took place over the course of four days in September 1994.  The trial judge used a jury box system for selecting jurors.  See United States v. Blouin, 666 F.2d 796, 796-97 (2d Cir. 1981) (describing the jury box method); DeBerry v. Portuondo, 277 F. Supp. 2d 150, 151 (E.D.N.Y. 2003) (same).  Pursuant to this method, a group of fourteen prospective jurors was seated in the jury box for voir dire.  After for-cause and peremptory challenges were exercised on the first batch of would-be jurors, the trial judge seated additional rounds until twelve jurors and two alternatives had been empaneled.  Each side had twenty peremptory challenges.

The voir dire employed the following format.  First, the trial judge would ask the prospective jurors a series of rudimentary questions.  With occasional variations, jurors were asked where they lived; whether they were married; where they were employed; where their spouse was employed; whether they had any friends in law enforcement; whether they had ever been the victim of a crime; and whether they owned their own home.  Certain answers prompted additional inquiries from the judge.

Next, the prosecutor and defense counsel were each allotted twenty minutes to examine the prospective jurors on the panel.  My assessment of petitioner's Batson argument is complicated somewhat by the fact that the first three rounds of the attorneys' questioning—the only rounds pertinent to petitioner's claim—were conducted off the record.  At the close of the third round, defense counsel asked that subsequent rounds of questioning be placed on the record, and the trial judge acceded to this request.  Although the first three rounds of attorneys' questioning were not themselves recorded, at the final step of each round of voir dire, counsel conferred with the trial

3

judge on the record to discuss and obtain rulings on their respective challenges to members of the venire. During these conferences reference was made to the answers that counsel had elicited from panelists during off-the-record questioning.

I.     The First Round

Of the first fourteen potential jurors, five were excused from service for personal or health reasons. Among the five replacement prospective jurors, one, Jose Cabrera, was Hispanic. In his colloquy with the trial judge, Mr. Cabrera stated that he worked as an assistant superintendent in New York City Housing; he and his wife were separated and he had "no idea" what she did for a living; he had never been the victim of a crime; two of his girlfriend's relatives were corrections officers; and he did not own his home. The prosecution subsequently exercised a peremptory challenge against Mr. Cabrera, which defense counsel did not contest. In total, three individuals in the first panel were struck for cause. The prosecution peremptorily challenged two prospective jurors, including Mr. Cabrera, while the defense used its peremptory challenges to strike five prospective jurors. At the end of round one, four individuals had been empaneled.

II.    The Second Round

The second panel of fourteen prospective jurors included one Hispanic, Katherine Escobar. The interchange between the trial judge and Ms. Escobar transpired as follows:

> The Court: What do you do for a living?
> Ms. Escobar: I work for a flight kitchen.
> The Court: The ones who put meals on the airplanes?
> Ms. Escobar: Yes.
> The Court: What does your husband do?
> Ms. Escobar: Sells vacuum cleaners.
> The Court: Have you ever been the victim of a crime?
> Ms. Escobar: No.
> The Court: Do you have any close friends who are in law enforcement?

4

Ms. Escobar: Well, my husband was a police officer.

The Court: He was a police officer before going into Electroluxes [a brand of vacuum cleaner]?

Ms. Escobar: Right.

The Court: And do you think you would be able to follow my instructions regarding the testimony of a police officer, you would treat him the same as anyone else?

Ms. Escobar: Of course.

Transcript of Voir Dire Proceedings, September 8, 1994, at 88-89.

After off-the-record questioning was conducted by counsel, the parties and the trial judge

convened.  This conversation ensued with respect to Ms. Escobar:

The Court: Perempts by the People then?

Prosecutor: People would challenge for cause juror No. 1 [Ms. Escobar].

The Court: Not cause, perempt.

Prosecutor: Perempt juror No. 1.

Defense counsel: May I inject an objection here?

The Court: Yes.

Defense Counsel: Is this the proper time?

The Court: For what?

Defense Counsel: Well, on the last round, the district attorney's office objected to Mr. Cabrera, who was Hispanic American.  At this particular juncture, People are again objecting to another Hispanic, Ms. Escobar.  I want to bring it to the Court's and the record's attention.  The district attorney naturally objects, but it appears if this continues it would be a challenge as to excluding on account of race, being my client is Hispanic.

The Court: This would be nationality rather than race.

Defense Counsel: I don't know if they consider themselves a race, but I would agree with nationality.

Prosecutor: I would like to state for the record, so there is no question, I am challenging Ms. Escobar because her husband was on the police department for 13 years.  He did not retire.

The Court: Exactly.

Prosecutor: He is now a vacuum salesperson. I believe that Ms. Escobar would—

The Court: I was going to ask her about that, and [defense counsel's] objection came up, and I lost my sort of train of thought.  I though it was the sort of st[r]ange that anybody would leave the police department at the end of 13 years, when in 15 years he can get a pension, and go sell vacuum cleaners door-to-door.  I will give you that one.  There is no problem with that, that was number——

Clerk of the Court: One.

5

Id. at 109-11.

After several members of the second panel were struck for cause, the defense used peremptory challenges to exclude three prospective jurors, and the prosecution exercised six of its challenges, including the one against Ms. Escobar. One individual was empaneled, bringing the total number of accepted jurors to five.

III.    The Third Round

The third panel of fourteen included one Hispanic male, Anibale Mejia.  Questioning by the trial judge proceeded in this manner:

> The Court: Are you married?
> Mr. Mejia: Yes.
> The Court: What do you do for a living?
> Mr. Mejia: I am a doorman.
> The Court: What about your wife?
> Mr. Mejia: She works as a home assistant.
> The Court: Have you ever been a victim of a crime?
> Mr. Mejia: Yes.
> The Court: What was that?
> Mr. Mejia: My apartment was burglarized.
> The Court: Can you put that out of your mind and try this case fairly?
> Mr. Mejia: Yes.
> The Court: Do you have any close friends who are in law enforcement?
> Mr. Mejia: No.

Transcript of Voir Dire Proceedings, September 12, 1994, at 22-23.

After both sides had examined the panel members off the record, the prosecutor sought to use a peremptory challenge to exclude Mr. Mejia, generating this response from defense counsel.

> Defense Counsel: I would like to make a record that this [is the] third Hispanic that the district attorney has challenged peremptorily.  I feel that it is—well, I won't express.  I will just object to it based upon racial issues.
> The Court: If I recall what happen[ed] the other day, the one who was Spanish [Ms. Escobar] was let go because her husband was on the job, meaning the police department, for 13 years and very strange to leave after 13 years and not collect your

6

pension or anything like that.  And—

Defense Counsel: That was a Mr. Cabrero [sic], that the district attorney removed her peremptorily.  There was no basis given as there is now with Mr. Mejia.  It is the third Hispanic and every Hispanic that has sat on this jury has been objected to by the office of the district attorney.

Prosecutor: I would like to point out that the two victims in this case are Hispanic, two of the three victims.  That Mr. Mejia is an individual who has indicated he has been married several times; has several children where he doesn't know where they are and [the] People feel that he is not a good juror.

Defense Counsel: In response, the defendant is Hispanic here.

The Court: All right, Mr. Mejia did say he had two or three wives.  I don't know exactly what it was; several children by different wives; knew where one was, his latest offspring, but he didn't know where his other four children were.  What is that number?

Defense Counsel: Ten.

The Court: The next three up.

Id. at 39-41.

Ultimately, two prospective jurors were dismissed for cause.  The prosecution exercised peremptory challenges to exclude four potential jurors, including Mr. Mejia, and the defense peremptorily struck four panel members.  Four more individuals were empaneled, bringing the current total to nine.

IV.    The Fourth Round

Only ten prospective jurors were brought into the jury box for the fourth round.  Among them, Jorge Herrera was apparently the lone Hispanic.  Upon questioning by the judge and then by the prosecutor (the latter's voir dire now being conducted on the record at defense counsel's behest), Mr. Herrera stated that he sold real estate and worked part time as a waiter; he used to own a video store; his wife worked at a chocolate company; he had never been a crime victim; and he had no close friends in law enforcement.

Three prospective jurors were dismissed for cause, two were peremptorily struck by the

prosecution, and four were peremptorily struck by the defense. Jorge Herrera was the only individual empaneled.

## V. The Fifth Round

Fourteen persons were seated for the fifth round of voir dire, including at least one Hispanic, Lizzette Perez. The two final jurors had already been selected by the time Ms. Perez's name came up for consideration. Deemed acceptable by both sides, Ms. Perez became the second alternate juror. She would not have occasion to deliberate.

In sum, of the five members of the venire with Hispanic surnames, three were struck peremptorily by the prosecution (Mr. Cabrera, Ms. Escobar, Mr. Mejia), one was empaneled (Mr. Herrera) and one became an alternate (Ms. Perez). Of the eighteen peremptory challenges exercised by the prosecution, three were exercised to exclude prospective jurors with Hispanic surnames; two peremptory challenges went unused.

## B. State Appellate Proceedings

In his appeal to the Appellate Division, Reyes argued that the trial judge had erroneously credited the prosecution's race-neutral explanations for its challenges to Escobar and Mejia:

> During the voir dire, the record discloses that defense counsel twice objected to the prosecutor's use of peremptory challenges to prospective Hispanic jurors. In response, the prosecutor offered various explanations in an attempt to satisfy the trial court that the strikes were made for race-neutral reasons. *The record further discloses that the trial court accepted the prosecutor's explanations and allowed the prospective jurors in question to be excluded.* It is clear, however, that the prosecutor's proffered explanations were pretextual and that the court's acceptance of the explanations was erroneous.

Defendant's Brief to the Appellate Division 16 (emphasis added).

Petitioner advanced no specific argument with regard to the prosecution's strike against Mr.

Cabrera, which had not prompted a contemporaneous objection during voir dire. As for Ms. Escobar, petitioner contended that "the fact that [her] husband had supposedly left the police department and become a salesman had no bearing whatsoever on her suitability as a juror . . . ." Id. at 19. Likewise, petitioner maintained that "[w]hether or not Mr. Mejia had been married several times, or had several children with whom he did not maintain regular contact, could not serve as a basis for finding that he was unfit to serve as a juror." Id. at 19-20. The prosecutor's explanation with respect to Mr. Mejia, petitioner insisted, "was just the sort of silly and fantastic justification that must be branded as pretextual and therefore illegitimate." Id. at 20. The Appellate Division summarily rejected petitioner's Batson claim as "without merit." People v. Reyes, 239 A.D.2d at 525. Leave to appeal was denied, and this habeas petition followed.

## I

In his *pro se* application for a writ of habeas corpus, petitioner reiterated the claim of a Batson violation in the same language as he had asserted that claim in his state appeals. Namely, he argued that the trial judge had erred in his ultimate credibility assessment of the prosecutor's race-neutral explanations for the challenges to Escobar and Mejia. The fundamental problem with this argument is that if, as petitioner has consistently stated, "the trial court accepted the prosecutor's explanations" for the exercise of his peremptory challenges to exclude Escobar and Mejia, petitioner has failed to overcome the "great deference" due factual findings by a trial judge on this score. See Batson, 476 U.S. at 98 n.21.

The Supreme Court has "described th[e] duty of assessing the credibility of the prosecutor's race neutral reasons as embodying the 'decisive question' in the Batson analysis." Jordan v. LeFevre, 206 F.3d 196, 200 (2d Cir. 2000) (quoting Hernandez v. New York, 500 U.S. 352, 365

9

(1991)); Miller-El v. Cockrell, 537 U.S. 322, 338-39 (2003) ("[T]he critical question in determining

whether a prisoner has proved purposeful discrimination . . . is the persuasiveness of the prosecutor's

justification for his peremptory strike."); id. at 339 ("[T]he issue comes down to whether the trial

court finds the prosecutor's race-neutral explanations to be credible."). In Hernandez, a case where

the defendant sought direct review of the state courts' rejection of his Batson claim, the Supreme

Court held that a trial judge's finding on the issue of discriminatory intent should not be disturbed

unless it was "clearly erroneous." 500 U.S. at 369. As the Hernandez Court reasoned:

> Deference to trial court findings on the issue of discriminatory intent makes
> particular sense in this context because, as we noted in Batson, the finding "largely
> will turn on evaluation of credibility." In the typical peremptory challenge inquiry,
> the decisive question will be whether counsel's race-neutral explanation for a
> peremptory challenge should be believed. There will seldom be much evidence
> bearing on that issue, and the best evidence often will be the demeanor of the attorney
> who exercises the challenge. As with the state of mind of a juror, evaluation of the
> prosecutor's state of mind based on demeanor and credibility lies "peculiarly within
> a trial judge's province."

Id. at 365 (internal citations omitted). If anything, the deference afforded a trial judge's finding on

the issue of discriminatory intent is even greater on habeas corpus review, where the determination

that the prosecutor's explanation was credible is a factual finding that is presumptively correct until

defeated by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see Harris v. Kuhlmann, 346

F.3d 330, 354 (2d Cir. 2003) (noting that deference in the Batson context "is especially appropriate

in a habeas case, in which the state court's factual determinations are presumed to be correct and the

petitioner bears the burden of establishing that he is entitled to relief.")

A rare habeas case in which the findings of fact made by the trial judge as to the credibility

of the prosecution's race-neutral explanations were rejected, McClain v. Prunty, 217 F.3d 1209, 1223

(9th Cir. 2000), serves as a useful touchstone. In reversing the judgment of the district court and

holding that petitioner had established that "the prosecutor's proffered explanations were a pretext

for excluding [two black prospective jurors] from the jury because of their race," the Ninth Circuit

observed:

> Four of the six reasons the prosecutor gave for striking Jurors SR and JH were
> contrary to the facts . . . . We conclude that still other reasons were pretextual based
> upon comparisons of voir dire responses by non-black jurors who were seated
> without objection by the prosecutor . . . . Yet another offered justification was
> nonsensical (JH had her elbow on her chair).  In addition, the fact that all blacks in
> the venire pool were struck raises an inference of discrimination.

Id. at 1224.

    None of the several factors cited to justify the holding in McClain are present here.  There

is nothing in this record to suggest that similarly-situated non-Hispanic panelists were accepted by

the prosecution.  Nor is it the case that all the Hispanics in the venire pool were struck by the

prosecution.  Rather, two of the five panelists with Hispanic surnames were empaneled, one as an

alternate, despite the fact that the prosecution still had peremptory challenges available for use.  See

United States v. Alvarado, 923 F.2d 253, 256 (2d Cir. 1991) ("[T]he prosecution's decision not to

use an available challenge against minority veniremen is . . . a relevant circumstance to be

weighed."); Jordan v. LeFevre, 293 F.3d 587, 595 (2d Cir. 2002) ("that two blacks were seated on

the jury without the State's using peremptory challenges that remained available to it" is a factor to

be considered in determining whether credibility findings were clearly erroneous).

    Moreover, there is no allegation that, in defending its challenges, the prosecution made

representations that were "contrary to the facts" elicited from Escobar or Mejia during voir dire.

Prunty, 217 F.3d at 1224.  With respect to Escobar, the prosecution justified its strike on the theory

that Mr. Escobar's decision to leave the police force two years before the vesting of his pension was

unlikely to have been arrived at voluntarily. Considering that any animus harbored by Mr. Escobar

towards law enforcement was likely to be shared by Mrs. Escobar, the argument ran, what might

otherwise have been a prosecutor's ideal juror became a wild card not worth the risk. Petitioner does

not contest the accuracy of the facts relied upon by the prosecution to defend its challenge to

Escobar—apparently neither side during voir dire delved deeper into the circumstances surrounding

her husband's departure—but instead questions the propriety of the inference the prosecution (claims

to have) derived from those facts.

With respect to Mejia, the prosecutor observed that he "is an individual who has indicated

he has been married several times; has several children where he doesn't know where they are and

[the] People feel that he is not a good juror." Again, petitioner does not take issue with the stated

factual premise for the strike—that is, he does not dispute that Mejia had been married multiple

times and had children from those marriages with whom he did not maintain contact. Petitioner

instead insists that Mejia's familial history simply is not relevant to whether he was suitable to be

a juror in this case. In addition, petitioner argues that, even if Mejia's family history were a

legitimate basis on which to employ a peremptory strike, the evidence relied upon by the prosecution

was not viewed in its proper context, because there was other evidence that suggested that Mejia now

maintained more stable family relations.

Contrary to petitioner's argument, it is clear that, unlike in McClain, the reasons given by the

prosecution here to defend its challenges to Escobar and Mejia do not compel a finding of intentional

discrimination on its part. See United States v. Stafford, 136 F.3d 1109, 1114 (7th Cir. 1998)

(Posner, C.J.) ("When in response to a Batson challenge the prosecutor gives a race-neutral reason

that persuades the judge, there is no basis for reversal on appeal unless the reason given is

12

completely outlandish or there is other evidence which demonstrates its falsity."). At best, petitioner's arguments support a conclusion that the evidence available to the trial judge could have provided him with some basis to doubt the sincerity of the prosecution's race-neutral explanations for its challenges to Escobar and Mejia. What petitioner has plainly failed to show, however, is that in crediting the prosecutor's explanation with respect to each challenge, the trial judge took an impermissible or unreasonable view of the evidence. And as the Supreme Court has held, "where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." Hernandez, 500 U.S. at 369 (quoting Anderson v. Bessemer City, 470 U.S. 564, 574 (1985)).

All of the foregoing factors serve to substantially distinguish this case from McClain. The instant facts, instead, more closely resemble those in Hernandez, where the trial judge's factual findings were upheld by the Supreme Court on direct appeal. In Hernandez, the Court observed that, "[a]part from the prosecutor's demeanor, which of course we have no opportunity to review, the [trial] court could have relied on the facts that the prosecutor defended his use of peremptory challenges without being asked to do so by the judge . . . [and] that the ethnicity of the victims . . . tended to undercut any motive to exclude Latinos from the jury." 500 U.S. at 369-70. Both of these factors are likewise present in this case. Here, the prosecution provided race-neutral explanations without any prompting from the trial judge, and two of the three victims to the crime were Hispanic (a fact noted by the prosecution in support of its challenges). Under these circumstances, the trial judge's finding of no discriminatory intent cannot be said to be clearly erroneous.

While it is plain that the trial judge's "substantive" determination denying the Batson motions does not provide a basis for the writ to issue, a slightly more nettlesome question is posed by the

belated challenge—raised by assigned counsel—to the trial judge's "procedural" handling of the

Batson objection to the strike against Mejia. As previously mentioned, the prosecutor explained his

rationale for that strike as follows: "Mr. Mejia is an individual who has indicated he has been

married several times; has several children where he doesn't know where they are and [the] People

feel that he is not a good juror." After defense counsel interjected a brief comment, the trial judge

stated: "All right, Mr. Mejia did say he had two or three wives. I don't know exactly what it was;

several children by different wives; knew where one was, his latest offspring, but he didn't know

where his other four children were." The trial judge then allowed the strike to stand and dismissed

Mejia. What the trial judge arguably did not do was to "explicitly" adjudicate the credibility of the

explanation advanced by the prosecutor before denying petitioner's Batson motion.  Petitioner's

habeas counsel now contends that this failure constitutes reversible error. See Petitioner's Brief at

15-18 (citing Jordan v. LeFevre, 206 F.3d 196, 200 (2d Cir. 2000), and Barnes v. Anderson, 202 F.3d

150, 156-57 (2d Cir. 1999), for the proposition that an "explicit" credibility determination by judges

deciding Batson questions is required).[1]

On the threshold question of whether petitioner has procedurally forfeited his right to argue

at this juncture that the trial judge failed to "explicitly" adjudicate the credibility of the prosecutor's

race-neutral explanation, it should be noted that, beyond the failure of petitioner's trial counsel to

raise that issue with the trial judge during voir dire, petitioner did not argue to the Appellate Division

---

[1]There is no doubt—and habeas counsel does not attempt to argue otherwise—that the trial judge credited the race-neutral explanation proffered by the prosecution to defend its strike against Escobar. While the trial judge did not render that conclusion in haec verba, he is not required to do so. See Galarza v. Keane, 252 F.3d 630, 640 n.10 (2d Cir. 2001) (noting that the trial court does not have to give a "talismanic recitation of specific words in order to satisfy Batson" and that a "general crediting of the prosecutor's race-neutral explanations" will typically suffice).

or in his *pro se* habeas corpus petition that (1) an explicit credibility determination by the trial judge is required and (2) one was not made in this case.  On the contrary, the manner in which petitioner consistently framed the argument at all prior stages of this litigation indicates that he clearly understood the trial judge to have credited the race-neutral explanation offered by the prosecution to defend its strike against Mejia.  The failure of petitioner to make this precise argument up until this point should preclude habeas counsel from raising it now.  Nevertheless, I address it.

In <u>United States v. Thomas</u>, 320 F.3d 315 (2d Cir. 2003), the Second Circuit held that "[t]he government . . . is not required, when challenged, to persuade the court that its race-neutral reasons for striking jurors are valid or tactically sound; it is enough that they are the government's reasons. But a finding to that effect is needed, and it is error to deny a <u>Batson</u> motion without determining whether the prosecution's race-neutral explanations for the challenged peremptory strikes are credible."  <u>Id.</u> at 320.  The Second Circuit then explained how such a determination may be made:

> One way to do that is for the court *to confirm the accuracy of the prosecutor's explanation* (e.g., that the juror was impatient or evasive); another is to find that the prosecutor's stated reason for the challenge reflects the prosecutor's good faith belief, even if the judge would not have stricken the same juror, or would have stricken the juror for another reason.

<u>Id.</u> (emphasis added).

<u>Galarza v. Keane</u>, 252 F.3d 630 (2d Cir. 2001), is illustrative of "one way" that a trial judge may determine the credibility of a prosecutor's race-neutral explanation, i.e., by confirming the accuracy of that explanation.  During voir dire, defense counsel objected to the prosecution's use of peremptory challenges to exclude five panelists with Hispanic surnames, two of whom were identified as Ms. Valez and Mr. Vasquez.  The prosecutor explained her reasons for striking those two prospective jurors as follows:

15

> My reason for striking Ms. Valez off—I thought she had a problem understanding.
> I think it was communicated when she was up at the bench yesterday during the
> initial discussions. Mr. Vasquez, also clearly in my impression, had a problem
> understanding. He seemed somewhat confused yesterday when he came up to the
> bench and he was somewhat confused today when you asked him point blank
> questions about certain things, he would say no, then he would go ahead and answer
> in the affirmative. Again, that was my reason for striking him from the panel.

252 F.3d at 633. Once the prosecutor had presented her race-neutral explanations, defense counsel

reiterated his objections, saying "that the prosecutor had used her peremptory challenges against

everyone in the jury box who had a Hispanic surname." Id. at 634-35. The trial judge then made

his rulings. After observing that Batson vests in trial judges "certain responsibilities with respect

to fairness," he stated:

> Vasquez and Valez did join the line yesterday and came up. When I asked them what
> would you like to say, they looked at me clearly not knowing why they were there.
> . . . I had forgotten that. When the Assistant described that, that is clearly what
> happened.

Id. at 634. Based on this statement, the Second Circuit held that the trial judge had "*explicitly*

credited the prosecution's race neutral explanation for striking Vasquez and Valez, namely, that they

had problems understanding." Id. at 639 (emphasis added). It then upheld the denial of petitioner's

Batson motion as to those two panelists upon concluding that the trial judge's factual findings were

supported by the record.

In both Galarza and the present case, the trial judge expressly "confirm[ed] the accuracy of

the prosecutor's explanation" in the manner that Thomas stated was sufficient. Thomas, 320 F.3d

at 320. In Galarza, the trial judge, his memory jogged, announced his recollection that Vasquez and

Valez did have difficulty comprehending the proceedings. Here, the trial judge declared his

agreement with the prosecution's assertion that voir dire had revealed Mejia to have a somewhat

checkered familial history.  While a statement from the trial judge expressly confirming the factual

accuracy of the prosecutor's explanation falls somewhat short of a statement expressly crediting that

explanation as the true motive for the strike, such statement suffices for reasons of both practicality

and policy.  As a practical matter, the confirmation of the factual accuracy of the prosecutor's

explanation, followed by a denial of the defendant's Batson motion, supports a reasonable inference

that the trial judge made an implicit determination that the prosecutor's stated reason was the true

motive for the strike.  As a policy matter, because the petitioner was in a position to seek from the

trial judge a more explicit ruling on the issue of credibility, having failed to do so, he should not be

permitted to assert the resultant ambiguity (to the extent there is any) as a basis for upsetting his

conviction.

United States v. Perez, 35 F.3d 632 (1st Cir. 1994) (Coffin, J.), which involved a credibility

adjudication that was far less "explicit" than the one rendered here, is instructive.  Perez involved

a drug conspiracy prosecution brought against several Hispanic defendants.  During voir dire, the

prosecutor moved to strike a prospective juror with a Hispanic surname, and defense counsel

objected.  To defend his strike, the prosecutor stated that the prospective juror worked in the "inner

city," and "she may have, who knows, more contact with seeing drugs . . . . Who knows how that

cuts?" Lawyers for the defendants strenuously objected to that reasoning, calling it "outrageous" and

insisting that it "made no sense."  After conferring with his colleague, the prosecutor stated that the

"government's objection has nothing to do with her surname, we stand on the strike."  The district

judge responded only by stating "I understand" and allowed the strike.  Id. at 634.  On direct appeal,

the Court of Appeals declined to hold that it was error for the district judge to have rejected the

defendants' claim that the strike was racially motivated without explicitly crediting the prosecution's

17

explanation. Specifically, it held that, by virtue of her "I understand" remark, the district judge "*[i]n

effect* . . . denied defendants' challenge, *presumably* crediting the prosecution's stated explanation

and finding that the strike was not impermissibly motivated.  The district judge . . . who was able

to assess the prosecutor's demeanor at the moment the explanation was given, *evidently* believed that

the stated reason had some basis in fact.  We cannot say that the prosecutor's stated reason was so

illogical that it failed, as a matter of law, to support the trial judge's finding." Id. at 636 (emphases

added).

Judge Coffin, writing for the court, then observed that the district judge's efforts in

conducting the Batson inquiry fell rather short of the ideal:

> [A]s a general matter district courts should articulate the bases of their factual
> findings related to Batson challenges more clearly than occurred here. Specifically,
> especially in the face of continued disagreement by defense counsel, a district court
> should state whether it finds the proffered reason for a challenged strike to be facially
> race neutral or inherently discriminatory and why it chooses to credit or discredit the
> given explanation. Indicating these findings on the record has several salutary effects.
> First, it fosters confidence in the administration of justice without racial animus.
> Second, it eases appellate review of a trial court's Batson ruling. Most importantly,
> it ensures that the trial court has indeed made the crucial credibility determination
> that is afforded such great respect on appeal.

Id. Judge Coffin then explained why, notwithstanding this, reversal was inappropriate in the present

case.  After remarking "that this is the first time our Circuit has announced the desirability of express

Batson fact findings," he stated:

> [A]fter the court allowed [the prospective juror] to be struck without making express
> fact findings, . . . there was no further comment from defense counsel by way of
> elaboration of his thought, objection, dissatisfaction with the prosecutor's
> explanation, or request for examination. At that point, if defense counsel felt that the
> trial court had failed to actually assess the prosecutor's credibility or had made a
> precipitous or erroneous judgment, it should have pointed this out.  Counsel could
> have explained why the prosecutor's rationale was "outrageous," "made no sense,"
> and did not deserve to be credited. The prosecutor then could have elaborated his

18

> reasons and the court presumably would have expressly made the above two findings. Since defendant failed to pursue the matter further at voir dire, upsetting the judgment for lack of a more detailed explanation by the trial court in this case would make little sense.

Id. at 636-37 (internal quotation marks and citation omitted). This policy consideration applies as well in the instant case. After the trial judge denied petitioner's Batson objection with respect to Mejia, his attorney did not suggest "that the trial court had failed to actually assess the prosecutor's credibility or had made a precipitous or erroneous judgment." Id. at 637. Indeed, petitioner's brief on direct appeal and his pro se application for a writ of habeas corpus were both premised on the assumption that the trial judge had credited prosecutor's race-neutral explanation. As in Perez, "[s]ince defendant failed to pursue the matter further at voir dire, upsetting the judgment for lack of a more detailed explanation by the trial court in this case would make little sense." Id.

The considerations underlying the holdings in Thomas and Perez apply to an even greater degree in a habeas corpus proceeding. Title 28 U.S.C. § 2254(e)(1) provides that: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). "[T]he presumption applies with particular force to credibility determinations, as the Supreme Court has ruled that such determinations receive 'special deference' from the federal courts." McQueen v. Scroggy, 99 F.3d 1302, 1310 (6th Cir. 1996) (citation omitted). Significantly, an explicit finding of fact is not required to trigger the presumption of correctness. As the Court explained in Townsend v. Sain, 372 U.S. 293 (1963):

> If the state court has decided the merits of the claim but has made no express findings, it may still be possible for the District Court to reconstruct the findings of the state trier of fact, either because his view of the facts is plain from his opinion or because of other indicia.

19

Id. at 314. The Supreme Court has repeatedly held that a habeas court may apply the presumption of correctness to factual findings (including credibility determinations) that were not explicitly stated by the trial judge but could be implied from his legal conclusion. See Marshall v. Lonberger, 459 U.S. 422 (1983) (trial judge's legal conclusion that defendant's guilty plea to a previous charge was admissible into evidence contained an implicit factual determination that defendant's testimony that he had not been given opportunity to review the indictment for the charged offense lacked credibility); LaValee v. Delle Rose, 410 U.S. 690 (1973) (trial judge's legal conclusion that defendant's confessions to the police were voluntary and legally admissible in evidence contained an implicit factual determination that defendant's testimony that his confessions were the result of police coercion was not credible); see also Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000) (Becker, C.J.) (pursuant to the teachings of Marshall and LaValee, "our duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it"); Whitaker v. Meachum, 123 F.3d 714, 715 (2d Cir. 1997) (on federal collateral review, "deference is owed 'to implied as well as express findings of fact'" (quoting Ventura v. Meachum, 957 F.2d 1048, 1055 (2d Cir. 1992))); McQueen, 99 F.3d at 1310 (the presumption of correctness "applies to implicit findings of fact, logically deduced because of the trial court's ability to adjudge . . . demeanor and credibility").

The Supreme Court's decision in Wainwright v. Witt, 469 U.S. 412 (1985), a habeas corpus case, is particularly apposite. There, the factual issue presented was whether "juror Colby was properly excused for cause." Id. at 430. Although the state trial judge had excused the prospective juror without an explicit factual finding that he was biased, the Supreme Court held that the finding

20

of bias was implicit in the decision of the trial judge to excuse the prospective juror.  Then-Justice

Rehnquist, speaking for the Court, wrote:

> [W]e conclude that juror Colby was properly excused for cause.  Applying the
> analysis required by § 2254(d), we have already determined that the question of
> challenge for bias is a "factual issue" covered by the section.  Nor does respondent
> seriously urge that the trial court's decision to excuse juror Colby for bias was not a
> "determination after a hearing on the merits." . . . . *Nor do we think under the
> circumstances that the judge was required to announce for the record his conclusion
> that juror Colby was biased, or his reasoning.  The finding is evident from the
> record.*  See Marshall v. Lonberger, 459 U.S. at 433.  In this regard it is noteworthy
> that in this case the court was given no reason to think that elaboration was
> necessary; defense counsel did not see fit to object to juror Colby's recusal, or to
> attempt rehabilitation.

Id. at 430-31 (footnote omitted) (emphasis added); accord Jones v. Butler, 864 F.2d 348, 362 (5th

Cir. 1988) (holding that state court's refusal to dismiss a prospective juror for cause based on an

asserted lack of impartiality reflected an implicit factual finding that the juror was not biased).

Nevertheless, petitioner relies upon language in several Second Circuit decisions as support

for the proposition that an explicit credibility adjudication is required in the Batson context, with the

converse of that proposition being that a factual finding on the issue of the prosecutor's credibility

cannot be implied by a habeas court.  In light of the consistent line of contrary precedent, the premise

for this argument could only be that the Batson context is special and is exempted from the general

rule otherwise permitting the implication of factual findings.  This proposition, however, is not borne

out by an examination of the relevant case law.

In articulating the three-stage, burden-shifting analysis for resolving whether a peremptory

strike has been exercised in a racially discriminatory manner, the Supreme Court has not held that

a trial judge must explicitly adjudicate the credibility of a party's race-neutral explanation for its

challenge to a prospective juror.  If anything, the Supreme Court has suggested that a credibility

adjudication rendered in implicit form may suffice under certain circumstances. See Hernandez, 500

U.S. at 357 n.2 (noting that "[t]he trial judge *appears* to have accepted the prosecutor's reasoning

as to his motivation"; subsequently holding that the trial judge "chose to believe the prosecutor's

race-neutral explanation," which "represents a finding of fact") (emphasis added); see Dobbin v.

Greiner, 249 F. Supp. 2d 241, 252-53 (S.D.N.Y. 2002) (reading Hernandez to suggest that an

implicit credibility determination is sufficient). Dobbin, like the instant case, involved a post-

AEDPA habeas petition. The district court held that, notwithstanding language in the Second Circuit

decisions invoked by petitioner here, "the United States Supreme Court has not held that the

credibility adjudication must be 'explicit.' Hence, I think our Court does not have power to grant

habeas on the ground that a state trial judge did not make an 'explicit' ruling on the credibility of the

prosecutor's explanation." 249 F. Supp. 2d at 252; see also Lancaster v. Adams, 2001 U.S. Dist.

LEXIS 25143, *15-*16 (E.D. Mich. Sept. 25, 2001) (holding that "[t]he trial court's implicit factual

determination concerning the prosecutor's credibility on the question of discriminatory intent is

entitled to a presumption of correctness.").

McKinney v. Artuz, 326 F.3d 87 (2d Cir. 2003), the most recent Second Circuit decision to

address the issue (in the context of a reverse-Batson challenge raised in a post-AEDPA habeas

petition), reserved decision on whether clearly established Supreme Court precedent requires the trial

judge to make an express ruling on the credibility of the proffered race-neutral explanation. Judge

Sack wrote: "Because we think that the trial court made an express ruling . . ., we need not and do

not decide whether clearly established Supreme Court precedent required the court to do so in this

case." Id. at 101. Referring to Second Circuit cases that the petitioner there had cited as having

answered that question in the affirmative, see Jordan v. LeFevre, 206 F.3d 196, 200 (2d Cir. 2000);

22

Barnes v. Anderson, 202 F.3d 150, 156-57 (2d. Cir. 1999), Judge Sack (the author of Barnes) observed that "a state court's failure to abide by the decisions of a *federal court of appeals* does not alone provide a sufficient basis for granting habeas relief from a state conviction under section 2254." Id. at 102 n.17 (citing Yung v. Walker, 296 F.3d 129, 135 (2d Cir. 2002)) (emphasis added).

    In any event, neither Jordan nor Barnes counsels in favor of granting the writ here. In Barnes, which involved a federal civil rights lawsuit brought by a black couple against several white Housing Court security officers arising out of a physical altercation between the parties, the defendants peremptorily struck three black prospective jurors, the latter two challenges triggering Batson objections from the plaintiffs. After the defendants had provided a race-neutral reason for the second challenge—that the prospective juror's son had been involved in multiple incidents with police officers—"[a] great deal of confusion followed." 202 F.3d at 157. At one point, the district judge stated that he found "the reason given is sufficient to take it out of the realm of race." Id. The Second Circuit held, however, that it was "not clear" whether, by virtue of this remark, the trial judge had "found that defendants' explanation was credible and, therefore, that plaintiffs had failed to carry their ultimate burden of proof or, instead, that defendants' explanation merely sufficed to satisfy their . . . burden of articulating a non-racial explanation." Id. Any inclination of the Second Circuit to err on the side of the former interpretation was vitiated by the district judge's subsequent pronouncement on the issue of whether either side had violated Batson in the exercise of their peremptory challenges:

> *I won't rule on credibility of attorneys right now myself*, but I find both cases have sufficient reason. I am not stating whether or not I buy all of your arguments even on this one [referring to one of plaintiffs' counsel's explanations] . . . . I think you have stated a reason to take it out, both of you have.

Id. (emphasis added).   Observing that "the credibility of an attorney offering a race-neutral explanation is at the very heart" of the Batson analysis, the Second Circuit in Barnes held that it simply could not "square the district court's *explicit refusal* to rule on the credibility of either attorney's explanation with the court's duty under" Batson. Id. (emphasis added).   The Second Circuit did not speak to the far different factual scenario presented in the instant case, where there was arguably no "explicit" credibility adjudication, but where there is nothing in the record to suggest that an implicit adjudication was not made.

Jordan v. LeFevre, 206 F.3d 196, 200 (2d Cir. 2000), is similarly unhelpful to petitioner. In Jordan, which like the case at bar involved a post-AEDPA habeas petition, petitioner was tried with a co-defendant on murder charges. In presenting his Batson claim on appeal, petitioner argued that the trial judge "improperly deprived Mr. Jordan and his codefendant their opportunity to carry their burden of persuasion at the third-step . . . ." Jordan v. Lefevre, 22 F. Supp. 2d 259, 274 (S.D.N.Y. 1998) (quoting Jordan's Br. To 1st Dept.). The Second Circuit agreed:

> The state trial judge presiding at Jordan's trial was not in a position to make the requisite determination as to discriminatory intent. In an effort to save "an awful lot of time" he ruled summarily on the Batson application after an extremely brief colloquy, and resisted counsel's efforts to make arguments regarding the peremptory strikes so as to create a full record. The trial judge could not properly decide the third Batson step because he granted counsel no time to identify the relevant facts and assess the circumstances necessary to decide whether the race neutral reasons given were credible and nonpretextual. This cursory treatment of Jordan's Batson application was not a meaningful inquiry into "the decisive question . . . whether counsel's race-neutral explanation for a peremptory challenge should be believed." Hernandez, 500 U.S. at 365.

Id. at 201. Unlike Jordan, the record in this case does not remotely suggest that the trial judge precluded "a meaningful inquiry" into whether the prosecution's race-neutral explanation for its challenge to Mejia should be believed.

24

While dicta in both <u>Barnes</u> and <u>Jordan</u> suggests that it is error for a trial court to deny a <u>Batson</u> motion without "explicitly" ruling on the credibility of the race-neutral explanations, <u>see</u> <u>Barnes</u>, 202 F.3d at 156; <u>Jordan</u>, 206 F.3d at 200, the holdings in those cases simply reflect the principle that a trial judge must *actually* rule on the credibility of the race-neutral explanation offered in response to a <u>Batson</u> objection, and that such a ruling can only be made after the parties have been given a full and fair opportunity to be heard.  They are not at odds with prevailing law that the ruling on credibility may be implied from the record.

In sum, petitioner is not entitled to relief on his <u>Batson</u> claim.  The trial judge rejected his <u>Batson</u> objection to the peremptory challenge against Mejia based on his implied finding that the prosecution's race-neutral explanation for that challenge was not pretextual.  Moreover, the trial judge made an explicit finding that the prosecution's explanation for its challenge to Escobar was credible.  Each finding is entitled to a presumption of correctness that petitioner has plainly failed to overcome.

25

## II

While I deny the petition on its merits, there is a compelling argument to be made that, even

if the trial judge had committed error here, the error should be considered harmless in a habeas

corpus proceeding. The Supreme Court has not directly addressed whether "<u>Batson</u> errors," defined

broadly to include any error made by the trial judge in conducting the <u>Batson</u> inquiry, can ever be

subject to harmless error analysis on appeal. "Arguably, it has resolved the question by inference.

In cases . . . where the Court has found a violation of the <u>Batson</u> norm, it has reversed the conviction

or judgment outright without pausing to assess the harmlessness of the violation.  In none of these

cases, though, did the Court explicitly consider the application of harmless error analysis; it seemed

merely to assume that reversal was necessary.  The question of the appropriate appellate remedy for

<u>Batson</u> error seems to remain open."  Eric L. Muller, <u>Solving the <i>Batson</i> Paradox: Harmless Error,</u>

<u>Jury Representation, and the Sixth Amendment</u>, 106 Yale L.J. 93, 116-17 (1996) (footnotes omitted).

The argument in favor of applying harmless error analysis to <u>Batson</u> errors is that the racially-

motivated exercise of peremptory challenges violates the Equal Protection Clause right of an

excluded juror, not the right of the defendant; by the time a case reaches its appellate stage, it is too

late to rectify the harm done to the stricken juror.  More significantly, the Supreme Court has rejected

the notion that the commission of a <u>Batson</u> error deprives the defendant of an empirically reliable

verdict—that is, a verdict that "accurately describes the historical truth about the defendant's

involvement in, and responsibility for, the crime."  Muller, 106 Yale L.J. at 113.  On this basis,

without drawing any distinction between direct and collateral review, Professor Muller argues that

there exists no rationale for appellate review of <u>Batson</u> errors.  See <u>id.</u> at 118 ("A <u>Batson</u> violation

causes harm, of course, but it does not cause harm to any value that appellate reversal exists to

26

protect."). The premise of Professor Muller's argument is that "appellate reversal exists for one purpose only—to protect the reliability of the jury's 'factual finding' on the question of the defendant's guilt or innocence." Id. at 96.

Professor Muller takes too narrow a view of direct appellate review and the role it plays in providing for a full and fair opportunity to litigate a claim. Under his analysis, a defendant would never be able to obtain the reversal of his conviction on direct appeal when the trial judge erroneously refused to exclude evidence obtained from the defendant in violation of the Fourth Amendment. Such an error does not impair the ability of the factfinder to ascertain "the historical truth about the defendant's involvement in . . . the crime." Id. at 112. On the contrary, the admission at trial of unlawfully-seized evidence serves only to enhance the reliability of the fact-finding process. Nevertheless, direct appellate reversal is compelled if the erroneous admission of such evidence had an effect on the verdict.

Reversal of a conviction on direct appeal, where the underlying error does not undermine the reliability of the jury's finding on the question of guilt or innocence, may be justified because appellate review is necessary to provide a party with full and fair consideration of the underlying claim of error. See O'Berry v. Wainwright, 546 F.2d 1204, 1213 (5th Cir. 1977) (holding that, "where there are facts in dispute, full and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state court.") (emphasis omitted); see also Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 44 (2d Cir. 1986). Simply stated, if there are sufficiently compelling reasons of policy to warrant conferring third-party standing on a criminal defendant to assert the equal protection rights of a prospective juror, as the Supreme Court has held, then those reasons may also justify direct appellate review of a Batson error, even though

27

that error had no impact on the factual accuracy of the verdict.[2]

On the other hand, when a party asserts a <u>Batson</u> objection at trial, a favorable ruling by the judge can avert the violation of the challenged juror's rights. On appeal, that is no longer possible. Because of this distinction, Judge Newman has argued persuasively that, even on direct appeal, "in those rare cases where the corrective action required to be taken by <u>Batson</u> during jury selection is not taken, the incremental benefit of enforcing <u>Batson</u> by reversing convictions obtained with fairly representative juries [is] not warranted." <u>United States v. Alvarado</u>, 923 F.2d 253, 254 (2d Cir.1991) (Newman, J.).

In any event, the issue here is not whether a <u>Batson</u> error should be reviewed on direct appeal. Rather, it is whether habeas corpus relief should be granted to a petitioner who cannot show that he was prejudiced by a violation of his constitutional rights. A holding that such relief is available in a habeas corpus proceeding would be contrary to settled principles of habeas jurisprudence. Nevertheless, without acknowledging a difference between a direct appeal and a collateral attack on a judgment of conviction, <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 248 (2d Cir. 1998), held that <u>Batson</u> errors are "structural errors" that automatically entitle a petitioner to habeas corpus relief.

In <u>Tankleff</u>, a white male was charged with the murder of his parents. During voir dire, he

---

[2]Professor Muller, it should be noted, agrees with those Justices who believe that race and gender matter in jury selection. <u>See</u>, <u>e.g.</u>, <u>Batson v. Kentucky</u>, 476 U.S. 79, 121 (Burger, C.J., dissenting); <u>id.</u> at 138-39 (Rehnquist, J., dissenting); <u>Powers v. Ohio</u>, 499 U.S. 400, 424 (Scalia, J., dissenting); <u>J.E.B. v. Alabama ex. Rel. T.B.</u>, 511 U.S. 127, 148 (1994) (O'Connor, J., concurring). Unlike those Justices, however, he argues that the unlawful exclusion of jurors deprives a defendant of the Sixth Amendment right to a jury reflecting a fair cross section of the community. <u>See</u> Muller, 106 Yale L.J. at 149 ("Jury discrimination undermines the fairness of trials not by offending the Equal Protection Clause of the Fourteenth Amendment, but by abrogating the jury trial guarantee of the Sixth Amendment."). Under this approach, which was rejected by the Supreme Court in <u>Holland v. Illinois</u>, 493 U.S. 474, 486 (1990), Muller argues that what is characterized today as a <u>Batson</u> error would be subject to reversal on appeal.

objected that the prosecution was unlawfully using its peremptory strikes to exclude black prospective jurors. At the time of Tankleff's trial in 1990, the Supreme Court had held that, in order to establish a prima facie case of purposeful discrimination by the prosecutor in the selection of the petit jury in violation of the Equal Protection Clause, the defendant "must show that he is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." Batson v. Kentucky, 476 U.S. 79, 96 (1986) (internal citation omitted). The Supreme Court had yet to squarely address the issue of whether a white defendant could assert a violation of the Equal Protection Clause based on the prosecutor's use of peremptory challenges against non-white prospective jurors. Against this backdrop, the trial judge rejected Tankleff's effort to challenge the prosecutor's exercise of peremptory strikes to exclude black members of the venire. While Tankleff was pending on direct appeal, however, the Supreme Court considered the issue raised by Tankleff's objection in Powers v. Ohio, 499 U.S. 400 (1991), and held that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded jurors share the same race." Id. at 402.

On habeas review, the district court acknowledged that the trial judge's refusal to entertain Tankleff's claim was error in light of Powers, but held that error to be harmless. Tankleff v. Senkowski, 993 F. Supp. 151 (E.D.N.Y. 1997). Specifically, the district court reasoned that "[w]hen a reviewing court concludes that a trial judge would have had to rule differently under a new Supreme Court standard, it should not reverse automatically but should instead apply harmless-error analysis. On collateral review of a State court conviction, an error of constitutional magnitude is to be considered harmless unless it had a 'substantial and injurious effect or influence in determining

29

the jury's verdict.'" Id. at 157 (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993))) (other

citation omitted). "In the instant case," the district court concluded, "there is nothing in the nature

of this crime which implies a discriminatory use of peremptory strikes. Both the victims and the

petitioner are white. Moreover, . . . there was clearly no racial aspect to this case and no reason to

assume an illegitimate reason for peremptory challenges. Accordingly, the trial judge's failure to

entertain petitioner's objection does not warrant a new hearing because it did not result in a

substantial and injurious effect or influence in determining the jury's verdict." Id.

The Second Circuit reversed and remanded the case for the following reasons:

> Harmless error analysis is inappropriate . . . in the case of so-called "structural
> errors." See Arizona v. Fulminante, 499 U.S. 279, 310 (1991). The Supreme Court
> distinguished in Fulminante between "trial errors," which are subject to harmless
> error review, and "structural errors," which are not. The Court defined trial errors as
> those "which occurred during the presentation of the case to the jury, and which
> therefore may be quantitatively assessed in the context of other evidence presented
> in order to determine whether its admission was harmless beyond a reasonable
> doubt." In contrast, structural defects affect "the entire conduct of the trial from
> beginning to end." Such structural defects were said to include, for example, denial
> of the right to self-representation and, significantly for our purposes, "unlawful
> exclusion of members of the defendant's race from a grand jury."
>
> As the Supreme Court observed in Batson, "the basic principles prohibiting exclusion
> of persons from participation in jury service on account of their race are essentially
> the same for grand juries and for petit juries." 476 U.S. 79, 84 n.3 (internal quotation
> marks and citation omitted). Because the effects of racial discrimination during voir
> dire "may persist through the whole course of the trial proceedings," Powers, 499
> U.S. at 412, we hold that a Batson/Powers claim is a structural error that is not
> subject to harmless error review. . . .
>
> Assuming that the error is harmless because the defendant is white and there is no
> racial aspect to the case would perforce vitiate the rule of Powers—that a criminal
> defendant has third-party standing to raise the equal protection claims of the excluded
> jurors. Powers, 499 U.S. at 415. Significantly, the Court in Powers emphasized that
> a defendant is injured even when the excluded jurors are of a different race than his
> own because racial discrimination in jury selection "casts doubt on the integrity of
> the judicial process and places the fairness of a criminal proceeding in doubt." Id.

at 411 (citation and internal quotation marks omitted).

135 F.3d at 248 (some internal citations omitted).  <u>Tankleff</u>'s rejection of harmless error review of

<u>Batson</u> errors thus rests predominantly on two Supreme Court cases: <u>Arizona v. Fulminante</u>, 499

U.S. 279 (1991), and <u>Powers v. Ohio</u>, 499 U.S. 400 (1991).  Neither decision supports the breadth

of <u>Tankleff</u>'s holding.

<u>Fulminante</u> did not involve the issue of racial discrimination in the selection of grand or petit

jurors.  Rather, it held that the admission into evidence of a coerced confession was a "trial error"

subject to harmless error analysis.  499 U.S. at 285.  It is true that <u>Fulminante</u> observed that the

"unlawful exclusion of members of the defendant's race from a grand jury" came within the category

of errors the Court had held to be immune from harmless error review.  <u>Id.</u> at 310.  But the Supreme

Court case <u>Fulminante</u> cited for that proposition, <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986), was not

discussed or even cited in <u>Tankleff</u>.  Such a discussion is necessary, however, because despite the

convenient "structural" label used in <u>Fulminante</u> to denominate all errors not subject to harmless

error review, each error held to fall within that category does so for different reasons of policy.  So,

for example, the "total deprivation of the right to counsel at trial" is a structural error because

counsel "is critical to the ability of the adversarial system to produce just results," <u>Strickland v.

Washington</u>, 466 U.S. 668, 685 (1984), and because without counsel, "a criminal trial cannot reliably

serve its function as a vehicle for determination of guilt or innocence."  <u>Fulminante</u>, 499 U.S. at 310

(internal quotation marks and citation omitted).  The same can hardly be said of a <u>Batson</u> error:

> [T]he [Supreme] Court has firmly rejected the idea that a juror's race or gender has
> any bearing on how that juror will view the evidence in a case or vote on the question
> of guilt or innocence.  By taking this position, the Court has defined <u>Batson</u>
> violations in a way that absolutely forecloses any possibility that such violations
> affect the reliability of the verdict.  <u>Batson</u> violations do other bad things, of course:

31

> they stigmatize litigants and jurors, and wrongly prevent jurors from participating in the justice system. These are serious equal protection harms, but they have nothing to do with the reliability of verdicts.

Muller, 106 Yale L.J. at 96.

Nor are the particular policy considerations that justified the Court's disavowal of harmless error analysis in Vasquez applicable to the errors that typically form the basis of Batson claims raised in habeas corpus petitions. In Vasquez—which was decided in 1986, but addressed itself to an indictment handed down in 1962—Justice Marshall (writing for himself and Justices Brennan, Blackmun, Stevens and White) described the issue presented as whether the Supreme Court should adhere to "the rule requiring reversal of the conviction of any defendant indicted by a grand jury from which members of his own race were *systematically* excluded." 474 U.S. at 255 (emphasis added). Justice Marshall's opinion, and three of the four Justices who joined it, answered that question in the affirmative. Notably, however, Justice White "pointedly declined to join the key paragraph of Justice Marshall's opinion that established the rule of per se reversal." Muller, 106 Yale L.J. at 126 (footnote omitted); see Vasquez, 474 U.S. at 264 n.6 (noting Justice White's non-joinder).

Justice O'Connor, who filed a concurring opinion, agreed "that *upon proof of systematic exclusion* of blacks from a grand jury issuing an indictment, the admittedly costly remedy of reversal of a conviction thereafter obtained through a fair trial is necessary in order to eradicate and deter such discrimination." Id. at 266 (O'Connor, J., concurring) (emphasis added). She argued, however, that, "given the availability of this remedy [of automatic reversal] on direct review, it is [not] also necessary to make the same remedy available when the petitioner seeks to renew his claim of discriminatory exclusion on federal habeas corpus review." Id. She nevertheless concurred in the

32

judgment on the ground that the petitioner had not been afforded "a full and fair hearing on his discriminatory exclusion claim in state court." Id. Thus, "it is not even clear that Justice Marshall attracted five votes to the position that grand jury discrimination is automatically reversible in every case." Muller, 106 Yale L.J. at 126.

In any event, the facts in Vasquez cried out for remediation on habeas corpus review. The trial of Booker T. Hillery took place in Kings County, California in 1962. A single Superior Court judge in Kings County had personally selected all grand juries, including the one that indicted Hillery, for the previous seven years. 474 U.S. at 256. While blacks over the age of twenty-one (the minimum age requirement for grand jury service) made up nearly five percent of King's County's population by 1960, since 1893 not a single black person had ever been chosen to serve on a grand jury. See Hillery v. Pulley, 563 F. Supp. 1228, 1233 n.8, 1239 (E.D. Cal. 1983) (district court decision). Consistent with that unbroken trend, the grand jury that indicted Hillery comprised nineteen individuals, all of whom were white. At a hearing to address Hillery's motion to "quash the indictment on the ground that it had been issued by a grand jury from which blacks has been systematically excluded," Vasquez, 474 U.S. at 256, the same judge that had selected the grand jury "[a]bsolv[ed] himself of discriminatory intent" and refused to quash the indictment. Id. Hillery was subsequently convicted of first-degree murder. "For the next 16 years, [Hillery unsuccessfully] pursued appeals and collateral relief in the state courts, raising at every opportunity his equal protection challenge to the grand jury that indicted him." Id.

The reason for rejecting harmless error analysis was explained by Justice Marshall as follows:

[I]ntentional discrimination in the selection of grand jurors is a grave constitutional trespass, possible only under color of state authority, and wholly within the power of the State to prevent. Thus, the remedy we have embraced for over a century—the

33

only effective remedy for this violation—is not disproportionate to the evil that it seeks to deter. If grand jury discrimination becomes a thing of the past, no conviction will ever again be lost on account of it.

474 U.S. at 262 (internal footnote omitted).

Concern over the central role played by the state judge in the discriminatory act was also emphasized in <u>Rose v. Mitchell</u>, 443 U.S. 545 (1979), the most recent in a line of previously decided cases involving grand jury discrimination that <u>Vasquez</u> expressly declined to overrule. There, the Supreme Court justified the need for habeas corpus relief on the ground that "claims such as those pressed by respondents in this case concern allegations that the trial court itself violated the Fourteenth Amendment in the operation of the grand jury system. In most such cases . . . this same trial court will be the court that initially must decide the merits of such a claim, finding facts and applying the law to those facts." <u>Id.</u> at 561. In <u>Rose</u>, as in <u>Vasquez</u>, "the very judge whose conduct respondents challenged decided the validity of that challenge." <u>Id.</u> at 563. As the Supreme Court explained in <u>Rose</u>:

> Federal habeas review is necessary to ensure that constitutional defects in the state judiciary's grand jury selection procedure are not overlooked by the very state judges who operate that system. There is strong reason to believe that federal review would indeed reveal flaws not appreciated by state judges perhaps too close to the day-to-day operation of their system to be able properly to evaluate claims that the system is defective. The educative and deterrent effect of federal review is likely to be great, since the state officials who operate the system, judges or employees of the judiciary, may be expected to take note of a federal court's determination that their procedures are unconstitutional and must be changed. . . . [W]here the allegation is that the state judiciary itself engages in discrimination in violation of the Fourteenth Amendment, there is a need to preserve independent federal habeas review of the allegation that federal rights have been transgressed.

<u>Id.</u>

In terms of both its nature and degree, the constitutional violation identified by the Supreme

34

Court in <u>Rose</u> and <u>Vasquez</u>—and the violation for which automatic reversal on habeas review was thought to be the only appropriate remedy—is simply not the same violation that confronts habeas courts deciding <u>Batson</u> questions. In the <u>Batson</u> context, the trial judge is policing the conduct of both litigants rather than ruling on his own conduct or the conduct of his judicial colleagues, a fact that largely obviates the need for the automatic reversal backstop that <u>Rose</u> and <u>Vasquez</u> held to be necessary. Moreover, the conduct that <u>Batson</u> makes unlawful does not approach the systematic discrimination condemned in <u>Rose</u> and <u>Vasquez</u>—discrimination that deprived black defendants of the same right as white defendants to a jury (whether grand or petit) selected without discrimination on the basis of race. <u>See</u> <u>Strauder v. West Virginia</u>, 100 U.S. 303, 309 (1880); <u>see also</u> <u>Holland v. Illinois</u>, 493 U.S. 474, 479 (1990). <u>Batson</u> does not involve the violation of the right of a defendant to the equal protection of the laws; its focus is on the equal protection right of the excluded juror. It applies even where it is clear that there has not been a pattern of discriminatory challenges in the very case in which the defendant is tried. Thus, it is settled law that a <u>Batson</u> violation occurs where the prosecution or the defendant has been found to have struck a single juror on the basis of race, even where the prosecution or the defendant waived peremptory challenges, leaving other persons of that race on the jury. <u>See</u>, <u>e.g.</u>, <u>United States v. Thomas</u>, 303 F.3d 138, 146 (2d Cir. 2002) ("The finding of an absence of pattern strikes is useful, but the wrongful strike of [one black prospective juror] alone would implicate <u>Batson</u>.").

Properly read, <u>Vasquez</u> and <u>Rose</u> stand only for the sensible but somewhat narrow proposition that systematic and judicially-condoned discrimination in grand (and, by logical extension, petit) jury selection—that is, a course of unlawful exclusion marked by thoroughness and regularity, partaken or at least acquiesced in by those in the state system charged with the

35

administration of justice—is not amenable to harmless error analysis on federal habeas review. Such a pernicious and uncorrected evil, it was believed, required the strongest possible prophylactic remedy. Yet Vasquez also contemplated a future day where an aggressive and proven commitment on the state level to eradicate discrimination in jury selection might render automatic reversal by a federal habeas court a vastly disproportionate remedy for an isolated error. At such time, logic suggests that Vasquez's rule of automatic reversal should become, to employ Justice Marshall's words, "legitimately vulnerable to serious reconsideration." 474 U.S. at 266.

The difference between the systematic and judicially-condoned discrimination that furnished the justification for a rule of automatic reversal on habeas review in Vasquez and the conduct complained of in the typical habeas corpus petition alleging a Batson violation is the difference between night and day. In Tankleff, for example, the trial judge's rejection of the defendant's Batson claim was entirely consistent with Batson; it was only the retroactive application of Powers that created the error that formed the basis for the relief granted by the Second Circuit. More importantly, many, perhaps most, habeas corpus petitions do not even allege a "substantive" Batson error, which occurs when the trial court errs in its ultimate determination that the prosecution did not use its peremptory challenges in a discriminatory manner. Instead, they allege a "procedural" Batson error—a misstep by the trial judge in navigating the steps necessary to resolve a Batson objection. That misstep, which can take various forms, is usually the result of simple carelessness on the trial judge's part. As petitioner alleges was the case here, it might involve the failure of the trial judge to rule with sufficient "explicitness" on the credibility of the prosecution's race-neutral explanation. Or, where the defense objects to multiple peremptory challenges by the prosecution, the mistake might be the failure to make a ruling on each individual challenge. See, e.g., Galarza v. Keane, 252

36

F.3d 630, 636, 639 (2d Cir. 2001). Or it might involve an ambiguous comment by the trial judge that leaves it unclear whether she had found the prosecution met its threshold burden of articulating a race-neutral reason for its strike or, instead, had found the prosecution's explanation to be credible and not pretextual. See, e.g., Barnes v. Anderson, 202 F.3d 150, 156-57 (2d. Cir. 1999).

Perhaps because it recognized that Vasquez alone could not sustain the rejection by a habeas court of harmless error analysis in the petit jury context, Tankleff also relied on Powers v. Ohio, 499 U.S. 400 (1991), the facts of which were as follows. During voir dire, Powers, who was white, objected when the prosecutor exercised his first peremptory challenge to remove a black prospective juror. Powers asked the trial judge to compel the prosecutor to explain his reasons for the exclusion, but the judge denied the request and excused the juror. The prosecutor employed nine more peremptory challenges, six of which removed black members of the venire. Each time the prosecution challenged a black prospective juror, Powers renewed his objections, citing Batson. On each occasion, his objection was overruled. The defendant was subsequently convicted. See id. at 403.

The Supreme Court, hearing the case on direct appeal, vacated the conviction. The decision, authored by Justice Kennedy, reflected the premise that the Equal Protection right violated by the unlawful exercise of a peremptory challenge was not that of the defendant, but rather that of the excluded juror. See Edmonson v. Leesville Concrete Co., 500 U.S. 614, 618 (1991) (Kennedy J.) ("In Powers v. Ohio, . . . we made clear that a prosecutor's race-based peremptory challenge violates the equal protection rights of those excluded from jury service."). Consistent with that premise, the Supreme Court has since held that a Batson challenge is available to the prosecutor as well as a criminal defendant, see Georgia v. McCollum, 505 U.S. 42 (1992), and to both sides in a civil case.

37

See Edmonson, 500 U.S. at 618. Indeed, it is precisely because the Equal Protection right at stake is only that of the excluded juror that the Powers Court undertook its lengthy analysis of whether the defendant had standing as a third party to assert the violation of the prospective juror's right.

One criterion for third party standing identified in Powers is that "[t]he litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute." 499 U.S. at 411 (citation omitted). Crucially, however, the injury sustained by a criminal defendant as a result of the violation of the prospective juror's right need not be especially compelling in order to provide the defendant with a sufficiently concrete interest in the outcome of the issue to confer third-party standing. Indeed, Justice Kennedy suggested that this criterion could be satisfied by the possibility of harm to the defendant, and did not require actual harm:

> Active discrimination by a prosecutor during this process [of jury selection] condones violations of the United States Constitution within the very institution entrusted with its enforcement, and so invites cynicism respecting the jury's neutrality and its obligation to adhere to the law. The cynicism may be aggravated if race is implicated in the trial, either in a direct way as with an alleged racial motivation of the defendant or a victim, or in some more subtle manner as by casting doubt upon the credibility or dignity of a witness, or even upon the standing or due regard of an attorney who appears in the cause.

Id. at 412.

Justice Kennedy also emphasized that, unlike instances where a defendant seeks to object to the introduction against him of evidence obtained unlawfully from a third party, a situation where third-party standing has been denied by the Court, the constitutional violation of the prospective juror's rights took place during the trial itself. "The overt wrong, often apparent to the entire jury panel, casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the

38

law throughout the trial of the cause.  The voir dire phase of the trial represents the jurors' first

introduction to the substantive factual and legal issues in a case. The influence of the voir dire

process may persist through the whole course of the trial proceedings." Id. (internal quotation marks

and citation omitted).  Thus, he reasoned,

> [i]f the defendant has no right to object to the prosecutor's improper exclusion of
> jurors, and if the trial court has no duty to make a prompt inquiry when the defendant
> shows, by adequate grounds, a likelihood of impropriety in the exercise of a
> challenge, there arise legitimate doubts that the jury has been chosen by proper
> means.  The composition of the trier of fact itself is called in question, and the
> irregularity may pervade all the proceedings that follow.

Id. at 412-13.  Finally, Justice Kennedy stated, the verdict, whether guilty or not guilty, will not be

"accepted or understood" as having been given in accordance with the law by persons who are fair

"if the jury is chosen by unlawful means at the outset." Id. at 413.  "Upon these considerations,"

Powers concluded, "we find that a criminal defendant suffers a real injury when the prosecutor

excludes jurors at his or her own trial on account of race." Id.

I do not quarrel with the conclusion that a party to a case in which one or more jurors have

been excluded because of race (or some other impermissible factor) sustains an injury that creates

a concrete interest in the outcome of the issue sufficient to justify third party standing.  Such a

concrete interest could be said to derive simply from the desire of the objecting litigant to prevent

his opponent from excluding a prospective juror whom that litigant wishes to see

empaneled—usually, it must be said, for precisely the same reasons that his adversary seeks to

eliminate that prospective juror.  In Tankleff, for example, the objection by the white defendant to

the exclusion of black prospective jurors probably owed to his desire to retain those individuals on

the jury because he perceived them as sympathetic in a case in which the only evidence of guilt was

a weak confession obtained by police overreaching. The irony, then, is that a stereotype based on race likely played as great a motivating role in the defendant's decision to voice a <u>Batson</u> objection as it may have in the prosecutor's decision to exercise the peremptory challenge in the first place.

But to say that a defendant has a personal stake in the resolution of whether a juror was unlawfully excluded that is sufficient to warrant third party standing is altogether different from saying that any specific constitutional right of the defendant was violated by that allegedly unlawful exclusion or that his injury is of sufficient magnitude to justify remediation in a habeas corpus proceeding. Granting a criminal defendant third party standing to assert a <u>Batson</u> objection at trial and providing for direct appellate review of the trial judge's ruling on that objection does not answer the question of whether, in ruling on the habeas claim of that third party, a federal court may consider the presence or absence of any meaningful practical effect on the trial due to the <u>Batson</u> error. Most such errors, to the extent they go unremedied on direct appeal, should be recognized for what they are—harmless. They result in no actual prejudice to the defendant and hence should be unremediable in a habeas corpus proceeding.

The question of whether the writ should be available where the petitioner is unable to establish actual harm from a violation of his constitutional rights was recently considered in <u>Francolino v. Kuhlman</u>, 365 F.3d 137 (2d Cir. 2004), which involved a challenge to a special assignment system that enabled the District Attorney to effectively select the judge who would preside over petitioner's jury trial. The Second Circuit declared that "a criminal justice system in which the prosecutor alone is able to select the judge of his choice . . . raises serious concerns about the appearance of partiality, irrespective of the motives of the prosecutor in selecting a given judge." <u>Id.</u> at 141. The Second Circuit emphasized its distaste for the challenged system, quoting with

40

approval other circuit court decisions stating that the practice of prosecutorial judge-shopping, "if undertaken on a large scale, arguably threatens the independence of the judiciary," United States v. Pearson, 203 F.3d 1243, 1264 (10th Cir. 2000), and "is certainly unsightly . . . [and] lacks the appearance of impartiality." Tyson v. Trigg, 50 F.3d 436, 442 (7th Cir. 1995). See Francolino, 365 F.3d at 141. Nevertheless, while "due process requires a neutral and detached judge in the first instance," id. (quotation marks and citations omitted), and while the denial of an unbiased judge is a structural error, see Tumey v. Ohio, 273 U.S. 510, 523 (1927), the Second Circuit held that "petitioner's conviction under a judicial assignment system that invokes concerns about impartiality does not, by itself, deprive him of a neutral and impartial judge presiding at trial." 365 F.3d at 141.

More to the point, the Second Circuit declined to hold that the Appellate Division's "decision denying petitioner a new trial, based on the occurrence of judge-shopping alone *without any showing of actual prejudice*," was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, so as to warrant habeas relief under 28 U.S.C. section 2254. Id. at 142 (emphasis added). The Second Circuit also rejected petitioner's argument that it should review his claim of actual prejudice (based upon the trial judge's allegedly pro-prosecution rulings and remarks) under a more relaxed standard that would not otherwise be applicable in a habeas corpus proceeding. See id. at 143. Significantly, the Second Circuit drew a distinction between the harmless error standard that applies on direct appeal and the harmless error standard that applies on habeas review. Judge Cabranes emphasized that by insisting on the more rigorous standard for habeas relief in evaluating claims of misconduct regardless of whether judge-shopping occurs, "we do not thereby hold that judge-shopping is unremediable. Rather, we hold that, in the absence of a showing of actual prejudice, habeas proceedings are not the vehicle for

41

rectifying these constitutional concerns." Id. at 143.  He held open the possibility, however, that the

Second Circuit "would apply a different standard of prejudice if we were reviewing an appeal from

a conviction in federal court, or a claim asserted in federal court prior to [state] trial" by way of a

writ of mandamus.  Id.  In sum, consistent with the principle that "on federal collateral review, the

petitioner bears the burden of proving that his constitutional rights were violated," Whitaker v.

Meachum, 123 F.3d 714, 716 (2d Cir. 1997), Francolino held that the appearance of

impropriety—clearly created by a process whereby the prosecutor can choose the trial judge—does

not alone provide a basis for granting habeas corpus relief.

In Tyson v. Trigg, 50 F.3d 436 (7th Cir. 1995), a case involving a practice similar to the one

at issue in Francolino, Judge Posner acknowledged that a state system allowing the prosecutor to

select the trial judge lacked the appearance of impartiality, but also held that this was insufficient to

warrant habeas relief absent a showing of actual prejudice to the defendant.  Judge Posner insisted

that "[g]eneralities about fair trials and evenhanded justice are not a substitute for specific holdings

as a basis for a state prisoner's claiming in a federal habeas corpus proceeding that an established

right of his was infringed." Id. at 440 (emphasis omitted).  Importantly, Judge Posner stated that the

mere appearance of impropriety did not justify the grant of habeas corpus relief, "despite" the

Supreme Court's holding in Powers, upon which the petitioner had heavily relied.  Id. at 442.

Powers, he wrote, was distinguishable from the case at bar because it involved race:

> Powers holds that a defendant can complain about a prosecutor's racially motivated
> use of peremptory challenges even if the jurors whom the prosecutor used his
> challenges to strike would not have been favorable to the defendant.  Powers is thus
> a kind of appearance-of-impropriety case. But race is special in the Supreme Court's
> thinking about criminal procedure.

Id.  While Judge Posner's point is well taken, it is incomplete.  Powers can also be distinguished

because it was a direct appeal from a judgment of conviction. Thus, it did not implicate or address the countervailing considerations that have restrained the use of the writ, and that have tipped the balance against granting habeas relief, even in cases where the decidedly "special" factor of race was involved.

Of particular significance on this point is <u>Teague v. Lane</u>, 489 U.S. 288 (1989). During jury selection for petitioner's trial, the prosecutor had used all ten of his peremptory challenges to exclude blacks. <u>Id.</u> at 293. In pressing his claim of error on appeal, the petitioner could not rely on the Supreme Court's holding in <u>Batson</u>, because his conviction had become final before that case was decided, and because the Court had held in a prior decision that the <u>Batson</u> rule does not have "such a fundamental impact on the integrity of factfinding as to compel retroactive application" on collateral review. <u>Allen v. Hardy</u>, 478 U.S. 255, 259 (1986) (per curiam). Thus, seeking to build upon a prior Supreme Court decision holding that the Sixth Amendment required that the jury venire be drawn from a fair cross section of the community, the petitioner argued that the use of race-based peremptory challenges by the prosecution violated his Sixth Amendment right to be tried by a petit jury that was representative of the community.

The Supreme Court, however, declined to reach the merits of the petitioner's claim on the ground that, even if it were to agree that the fair cross section requirement should be extended to the petit jury, it would be announcing a "new constitutional rule of criminal procedure." <u>Teague</u>, 489 U.S. at 299. The Court held that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." <u>Id.</u> at 310. The Court further held that the new rule urged by the petitioner did not come within a narrow exception to the general principle that habeas corpus may not be used as a vehicle for granting relief

43

based on a new rule.  That exception applied only where the new rule involved a procedure "that

implicates the fundamental fairness of the trial."  Id. at 312.  The Court reasoned:

> Because the absence of a fair cross section on the jury venire does not undermine the
> fundamental fairness that must underlie a conviction or seriously diminish the
> likelihood of obtaining an accurate conviction, we conclude that a rule requiring that
> petit juries be composed of a fair cross section of the community would not be a
> "bedrock procedural element" that would be retroactively applied under the . . .
> exception we have articulated.

Id. at 315.  While Justice O'Connor wrote for a plurality of four Justices in Teague, Teague's

prohibition on the retroactive application on collateral review of new constitutional rules of criminal

procedure—admitting of a narrow exception for rules "implicating the fundamental fairness and

accuracy of the criminal proceeding"—has become settled law.  See Beard v. Banks, 124 S. Ct.

2504, 2513 (2004).  Moreover, the grounds upon which a fifth Justice—Justice White—concurred

in the plurality's opinion further illustrates that, even in cases that involve the "special" factor of

race, Tyson, 50 F.3d at 440, where the claimed error does not implicate the fundamental fairness and

accuracy of the criminal proceeding, the considerations counseling against the use of habeas corpus

as a remedial vehicle have proved determinative.  Specifically, Justice White concurred in the part

of the plurality opinion that rejected the petitioner's effort to distinguish his case from Allen v. Hardy

and thus to avail himself of the Court's decision in Batson.  Justice White also agreed that, by failing

to raise an Equal Protection claim based on pre-Batson jurisprudence at trial or on direct appeal, the

petitioner had procedurally defaulted review of that claim.  Id. at 297.  The latter holding was

consistent with earlier Supreme Court cases that held that claims of racial discrimination in the

selection of the grand jury, raised for the first time in a habeas proceeding, were procedurally

forfeited because the petitioner could not make a showing of cause for the default and prejudice

resulting therefrom. <u>See</u> <u>Davis v. United States</u>, 411 U.S. 233 (1973) (a defendant's failure to raise

a pretrial objection to alleged discrimination in the composition of the federal grand jury precluded

habeas corpus relief, absent a showing of cause and prejudice); <u>Francis v. Henderson</u>, 425 U.S. 536,

541 (1976) (applying <u>Davis</u> to a state defendant who failed to make a timely challenge to the

composition of the grand jury).

These cases reflect the overriding "principle that collateral review is different from direct

review [that] resounds throughout our habeas jurisprudence." <u>Brecht v. Abrahamson</u>, 507 U.S. 619,

633 (1993). As the Chief Justice explained in <u>Brecht</u>:

> In keeping with this distinction, the writ of habeas corpus has historically been
> regarded as an extraordinary remedy, "a bulwark against convictions that violate
> 'fundamental fairness.'" <u>Engle v. Isaac</u>, 456 U.S. 107, 126 (1982) (quoting
> <u>Wainwright v. Sykes</u>, [433 U.S. 72, 97 (1977)] (Stevens, J., concurring)). "Those
> few who are ultimately successful [in obtaining habeas relief] are persons whom
> society has grievously wronged and for whom belated liberation is little enough
> compensation." <u>Fay v. Noia</u>, 372 U.S. 391, 440-441 (1963). <u>See also</u> <u>Kuhlmann v.</u>
> <u>Wilson</u>, 477 U.S. 436, 447 (1986) (plurality opinion) ("The Court uniformly has been
> guided by the proposition that the writ should be available to afford relief to those
> 'persons whom society has grievously wronged' in light of modern concepts of
> justice") (quoting <u>Fay v. Noia</u>, supra, at 440-441); <u>Jackson v. Virginia</u>, 443 U.S. 307,
> 332, n.5 (1979) (Stevens, J., concurring in judgment) (Habeas corpus "is designed
> to guard against extreme malfunctions in the state criminal justice systems").
> Accordingly, it hardly bears repeating that "'an error that may justify reversal on
> direct appeal will not necessarily support a collateral attack on a final judgment.'"
> <u>United States v. Frady</u>, 456 U.S. 152, 165 (1982) (quoting <u>United States v.</u>
> <u>Addonizio</u>, 442 U.S. 178, 184 (1979)).

<u>Id.</u> at 633-34. There is no need to rehearse here the compelling considerations that justify limiting

the writ to instances where the petitioner has been "grievously wronged" by the state criminal justice

system and that explain the various holdings that employ a more deferential standard of review on

habeas than on direct appeal, including the differing standards for assessing whether a trial error

resulted in prejudice to the defendant. In this case, far from being able to claim that he was

"grievously wronged," petitioner cannot even assert a claim that any constitutional right of his was violated, and setting aside the conviction will not undo the real harm done to the excluded juror. To the extent that upsetting petitioner's conviction on habeas helps to redress the "appearance of impropriety" that a Batson violation might give rise to, there is simply no authority supporting the issuance of the writ for such a purpose—indeed, there is a clear Second Circuit case to the contrary. See Francolino v. Kuhlman, 365 F.3d 137 (2d Cir. 2004).

A significant additional factor to be considered in determining the extent to which a run-of-the-mill procedural Batson error should be the subject of habeas corpus review is that such error can often be prevented by defense counsel at the time of its commission. See Brown v. Kuhlmann, 142 F.3d 529, 542 (2d Cir. 1998) (holding that "petitioner's conduct is of relevance in determining the need for the writ" (citing Reed v. Farley, 512 U.S. 339 (1994))). Specifically, defense counsel could advise the trial judge that she has not yet ruled on a particular challenge, or seek from her an express credibility determination with respect to the prosecutor's race-neutral explanation, or request a relevant clarification—whatever the particular circumstances demand. Indeed, the First Circuit has found defense counsel's silence to be an important consideration in determining whether relief should be granted, even in the context of a direct appeal from a judgment of conviction. See United States v. Perez, 35 F.3d 632, 637 (1st Cir. 1994) ("[I]f defense counsel felt that the trial court had failed to actually assess the prosecutor's credibility or had made a precipitous or erroneous judgment, it should have pointed this out. . . . Since defendant failed to pursue the matter further at voir dire, upsetting the judgment for lack of a more detailed explanation by the trial court in this case would make little sense."); see also Galarza, 252 F.3d at 643 (Walker, C.J., dissenting) ("A few choice words from [defense] counsel, who properly should bear responsibility for this debacle, would have

46

saved years of direct and collateral review by avoiding this problem altogether.").

Under such circumstances, it is entirely fair to question whether granting habeas corpus relief is appropriate. I emphasize that this is not a question of procedural forfeiture under the standard enunciated in Wainwright v. Sykes, 433 U.S. 72 (1977). Nor is it simply a concern that the system not create an incentive for defense counsel to "sandbag"—that is, to raise the Batson issue at trial just enough to preserve it for appeal, but to make no real effort to actively pursue the objection once it is made. See Brown, 142 F.3d at 543; see also Nieblas v. Smith, 204 F.3d 29, 32 (2d Cir. 1999); Garcia v. Lewis, 188 F.3d 71, 82 (2d Cir. 1999). Instead, it is a fundamental consideration that goes directly to the issue of whether any "cause for collateral review . . . exists." Reed, 512 U.S. at 349 (Ginsberg J.).

I take to heart Justice Ginsberg's suggestion in Reed that, before placing any limitation on the writ, even where it can safely be concluded that the error alleged is not of sufficient magnitude to justify its issuance, one should take into account the possibility that the substantive right at issue (that of the prospective juror not to be excluded from jury service on the basis of race) may be undermined because limiting habeas review may lead to a diminished willingness on the part of state judges to enforce the Constitution. Id. at 348-49. In Brecht v. Abrahamson, 507 U.S. 619 (1993), Chief Justice Rehnquist addressed this precise concern in responding to the argument that "application of the Chapman [direct appeal] harmless-error standard on collateral review is necessary to deter state courts from relaxing their own guard in reviewing constitutional error and to discourage prosecutors from committing error in the first place." Id. at 636. He wrote:

> Absent affirmative evidence that state-court judges are ignoring their oath, we discount petitioner's argument that courts will respond to our ruling by violating their Article VI duty to uphold the Constitution. Federalism, comity, and the

47

> constitutional obligation of state and federal courts all counsel against any
> presumption that a decision of this Court will "deter" lower federal or state courts
> from fully performing their sworn duty.

Id. (internal citation omitted).  This observation applies with particular force in the Batson context,

because the procedure currently in place is premised on an implicit rejection of the notion that state

trial judges will neglect their own constitutional obligations in the absence of close federal

supervision.  Specifically, where the trial judge (having properly followed all the procedural steps)

ultimately rules that the prosecution's race-neutral explanation is credible, that finding is effectively

insulated from meaningful review in a habeas corpus proceeding, except for the most unusual case.

See, e.g., McClain v. Prunty, 217 F.3d 1209, 1223 (9th Cir. 2000).  Thus, the effectiveness of Batson

as a device to redress the improper use of peremptory challenges already *depends* on the presumption

that state judges are fully "performing their sworn duty."

On this score, it is useful to recall that *no* appellate review, much less yet an additional layer

of habeas corpus review, is available for many (perhaps most) Batson errors.  Specifically,

notwithstanding the fact that Batson is applicable to challenges exercised by the criminal defendant

and the prosecutor and to both parties in a civil case, there is no appellate review where there has

been (1) an error by the trial judge in denying a Batson objection made by the prosecutor; (2) an error

by the trial judge in denying a Batson objection made by the defendant when the defendant is

ultimately acquitted; and (3) similar misconduct in the selection of jurors by the eventual losing party

in civil case.  In each of the foregoing instances, no less than when a prosecutor exercises a

peremptory challenge on the basis of some unlawful consideration, the right of a prospective juror

to sit has been violated and the concerns expressed in Powers are present.  In the first instance, the

Double Jeopardy Clause would arguably preclude an appeal by the prosecutor from the judgment of

48

acquittal, although if the misconduct of the defendant during voir dire rises to the level of a "structural" violation, there is a basis for arguing that the defendant has forfeited his right not to be placed in jeopardy a second time. See Arizona v. Washington, 434 U.S. 497 (1978). In the second and third instances, meanwhile, any appeal would be moot, as neither an acquitted defendant nor a victorious civil litigant requires relief on appeal. The unavailability of appellate review in these three instances has not been the source of widespread discrimination in jury selection and it does not have appear to have had the adverse effect on the judicial system about which Powers was concerned. Nor has it been suggested that the structural integrity of civil and criminal trials has been undermined as a result.

Significantly, the reported cases involving Batson violations refute any basis for assuming any hostility or indifference to Batson by New York state appellate judges. While not susceptible to mechanical analysis, the evidence of hostility or indifference to Batson may be gauged by looking to two factors: (1) the extent to which the New York state appellate court system addresses Batson errors, and (2) the extent to which winning Batson habeas claims, unremedied at the state level, involve instances where a juror is found to have been excluded because of race, as opposed to instances where the trial judge is found to have tripped up in some way in navigating the procedural steps necessary to resolve the defendant's Batson motion.

With respect to the first factor, the New York Court of Appeals and the Appellate Division have reversed or remanded in no fewer than fifty-five cases because of errors made by trial judges in applying Batson. Because the number of New York cases vacating (empirically reliable) convictions on Batson grounds is so extensive, I annex those citations as an Appendix rather than include them as a footnote. A brief description of a recent case is illustrative. In People v. Carillo,

780 N.Y.S.2d 143 (1st Dept. 2004), the defendant, a male Hispanic, was convicted of selling cocaine to an undercover officer near a school.  During voir dire, defense counsel had raised a <u>Batson</u> challenge when six out of eight of the prosecutor's peremptory challenges were exercised against Hispanics. Upon being directed by the trial court to provide race-neutral reasons for each of those challenges, the prosecutor stated that he challenged a female Hispanic juror because he "just did not get a good feel from her . . . it was nothing in particular."  <u>See id.</u> at 144.  The trial court denied the <u>Batson</u> motion.  A unanimous panel of the First Department reversed, holding that "although a trial court's rulings on the issue of pretext are entitled to great deference because of its unique position to assess the credibility of the juror's responses and the attorney's explanations, the court's ruling that the prosecutor's reason for challenging the female Hispanic juror was not pretextual cannot be sustained."  <u>Id.</u> (internal citations omitted).  Specifically, the Appellate Division held that the prosecutor's explanation was just "the type of vague, non-specific and, thus, highly suspicious reason that we have previously held leads to an inescapable inference of discriminatory motive."  <u>Id.</u> at 144-45 (citations omitted).  These grounds for reversal reflect a generous application of <u>Batson</u>.  <u>Compare</u> <u>United States v. Thomas</u>, 320 F.3d 315, 320 (2d Cir. 2003) ("The government . . . is not required, when challenged, to persuade the court that its race-neutral reasons for striking jurors are valid or tactically sound; it is enough that they are the government's reasons.")

Indeed, if New York appellate courts are to be accused of anything at all in the <u>Batson</u> context, it is that they have gone *overboard* in reversing convictions, doing so even where a "reverse-<u>Batson</u>" error was found to have been committed.  <u>See, e.g.,</u> <u>People v. Bhupsingh</u>, 746 N.Y.S.2d 490 (2d Dept. 2002); <u>People v. Sprague</u>, 721 N.Y.S.2d 205 (4th Dept. 2001); <u>People v. Britt</u>, 647 N.Y.S.2d 527 (2d Dept. 1996); <u>People v. Mack</u>, 632 N.Y.S.2d 798 (2d Dept. 1995).  Such an error,

50

which occurs where an objection by the prosecution to the defense's exercise of peremptory challenges is determined to have been improperly sustained by the trial judge, does not even implicate the Equal Protection Clause.  Overall, the many decisions reversing convictions provide evidence in the <u>Batson</u> context of what Judge Weinstein has recently found to be the case more broadly:

> In going through the records and briefs of these five hundred [habeas] cases, I am impressed by the fact that in many respects New York provides more extensive procedural and substantive protections for criminal suspects and defendants than do the federal trial and appellate courts.  The five district attorneys in the Eastern District of New York are, in general, scrupulous in enforcing state and federal limitations on prosecutions. . . . The New York trial and appellate judges are energetic, fair and learned, following the law with the help of excellent charge books and well-drawn statutes.

<u>In re Habeas Corpus Cases</u>, 298 F. Supp. 2d 303, 306-07 (E.D.N.Y. 2003).

Under these circumstances, it is not at all surprising that, of the very few <u>Batson</u> challenges that have encountered any degree of success on habeas review in New York federal courts, *not one* involved a meritorious substantive claim that a prospective juror had in fact been excluded on account of race.  Instead, they involved procedural missteps by the trial judge of one variety or another, with the result being that a habeas court simply could not know whether the prosecution had engaged in unlawful behavior or not.  See <u>Dobbin v. Greiner</u>, 249 F. Supp. 2d 241 (S.D.N.Y. 2002) (holding reconstruction hearing because trial judge, "by failing to conduct a meaningful . . . inquiry into whether the prosecutor's proffered race-neutral reason for its peremptory challenge was pretextual, . . . did not sufficiently follow the protocols required by <u>Batson</u>"; decision pending); <u>DeBerry v. Portuondo</u>, 2001 U.S. Dist. LEXIS 24967 (E.D.N.Y. 2001) (holding that reconstruction hearing was required to further develop the record as to the prosecutor's intent in exercising his

peremptory challenges to exclude four black jurors, where trial judge did not adjudicate the
credibility of the reasons offered by the prosecution to explain two of its challenges and wrongfully
disposed of defendant's objections to two other challenges on ground that no prima facie case had
been established; after conducting hearing, district court denied writ on ground that prosecutor's
challenges were not motivated by race, see 277 F. Supp. 2d 150 (E.D.N.Y. 2003)); Harris v.
Kuhlmann, 115 F. Supp. 2d 326 (E.D.N.Y. 2000) (ordering that defendant be granted new trial
because trial judge, by precluding the development of a full record, could not make a meaningful
determination as to whether the peremptory challenges exercised by the prosecutor were intentionally
discriminatory; on appeal, the Second Circuit affirmed, but directed the district court to conduct a
reconstruction hearing; case pending); Hughes v. Mitchell, 1999 U.S. Dist. LEXIS 19158 (S.D.N.Y.
1999) (ordering reconstruction hearing where "trial court failed to follow the three-step analytical
procedure required by the Supreme Court"; district court held that race-neutral explanations
furnished by prosecutor at the reconstruction hearing were credible and denied the writ, see 2004
U.S. Dist. LEXIS 15769 (S.D.N.Y. Aug. 11, 2004)).

Likewise, in its decisions in Galarza v. Keane, 252 F.3d 630 (2d Cir. 2001), Jordan v.
LeFevre, 206 F.3d 196 (2d Cir. 2000), and Tankleff v. Senkowski, 135 F.3d 235 (2d Cir. 1998), the
Second Circuit determined that the state trial judge had committed a quintessentially procedural
error, and ordered that a reconstruction hearing be held. On remand, each case ultimately resulted
in a determination that no prospective juror had been excluded on the basis of race. See Tankleff
v. Senkowski, 3 F. Supp. 2d 278 (E.D.N.Y. April 24, 1998) (on remand from Second Circuit,
remanding case to the state court on a conditional writ of habeas corpus for the purpose of holding
a hearing on petitioner's Batson challenge); Tankleff v. Senkowski, Indictment No. 1290-88 (N.Y.

Sup. Ct., Suffolk County October 28, 1998) (finding that the race-neutral reasons given by the prosecutor in exercising peremptory challenges to excuse two challenged jurors were not pretextual); Tankleff v. Senkowski, No. 96-507, Docket Entry #48, (E.D.N.Y. Jan. 4, 1999) (affirming state court decision); Galarza v. Keane, 2003 U.S. Dist. LEXIS 6709 (S.D.N.Y. April 21, 2003) (on remand from Second Circuit, reviewing affidavit from presiding trial judge and finding no Batson violation with respect to the three challenged jurors); Jordan v. Lefevre, 2000 U.S. Dist. LEXIS 18488 (S.D.N.Y. Dec. 26, 2000) (Mukasey, C.J.) (on remand, conducting reconstruction hearing and holding that prosecution's challenges were not race-based); aff'd, Jordan v. Lefevre, 293 F.3d 587 (2d Cir. 2002).

     In fact, despite the frequency with which Batson claims are litigated on habeas, it appears that no decision of the Second Circuit to date has resulted in a new trial for a petitioner who challenged his state conviction on Batson grounds. See McKinney v. Artuz, 326 F.3d 87 (2d Cir. 2003) (reversing district court's grant of writ); Overton v. Newton, 295 F.3d 270 (2d Cir. 2002) (same); Bryant v. Speckard, 131 F.3d 1076 (2d Cir. 1997) (same); McCrory v. Henderson, 82 F.3d 1243 (2d Cir. 1996) (same); Brown v. Kelly, 973 F.2d 116 (2d Cir. 1992) (affirming district court's denial of writ); Wilson v. Hoke, 945 F.2d 1250 (2d Cir. 1991) (same).

     In total, my research indicates that there have been only three published decisions of federal district courts in this state granting petitioner a new trial on Batson grounds that were not subsequently reversed by the Second Circuit. All involved procedural missteps by the trial judge of one variety or another. See Durant v. Strack, 151 F. Supp. 2d 226 (E.D.N.Y. 2001) (ordering new trial where trial judge, after hearing argument but not ruling on whether defendant had made a prima facie showing of intentional discrimination, directed the prosecutor to provide race-neutral reasons

for striking two jurors.  After expressing some doubt as to the veracity of the explanation offered by the prosecution with respect to one of the jurors, trial judge had nonetheless ruled that defendant had failed to make a prima facie case); Caston v. Costello, 74 F. Supp. 2d 262 (E.D.N.Y. 1999) (ordering new trial where trial court, having found a prima facie showing of racial discrimination in the prosecutor's exercise of five peremptory challenges, did not require the prosecutor to provide race-neutral reasons for three of her five challenges on the ground that defendant had waived his right to object to the exclusion of those three jurors; habeas court held that the invocation of the contemporaneous objection rule to bar defendant's Batson claim was not consistent with the manner in which New York state courts typically apply the rule in similar situations); cf. Rodriguez v. Schriver, 2003 U.S. Dist. LEXIS 20285 (S.D.N.Y. Nov. 10, 2003) (At reconstruction hearing conducted by federal court fifteen years after conviction, prosecutor acknowledged that it had been the "confluence" of the challenged juror's national origin and employment that had motivated him to exercise his peremptory challenge; court adopted magistrate's recommendation that prosecutor did not make an affirmative showing, as required in "dual motive" cases, that he would have struck juror absent the unlawful consideration; court therefore ordered new trial).

---

There are, undeniably, important values to be vindicated by Batson (ensuring the factual accuracy of verdicts is not among them, though promoting the *appearance* of factually accurate verdicts might be), and automatic reversal on direct appeal may have much to commend it.  Similar treatment on habeas corpus generally does not.  The overwhelming majority of non-frivolous Batson claims dealt with by habeas courts involve sloppiness on the trial judge's part, rather than "system-tainting" racial discrimination.  Where a petitioner alleges only that the trial judge tripped up in some

way in navigating the procedural steps necessary to resolve petitioner's <u>Batson</u> motion, as distinct

from a claim that the trial judge permitted the prosecutor to exclude a prospective juror on the basis

of race, and the error is one of the innocent mistakes that will inevitably be made in any system that

processes large numbers of cases in good faith, there is no good reason why a federal habeas court

should apply an automatic reversal rule, or further prolong the proceeding by remanding for a

reconstruction hearing years after the trial, instead of candidly acknowledging that the error did not

have an effect on the accuracy of the verdict and rejecting the claim on that ground.

**Conclusion**

The petition for a writ of habeas corpus is denied.  Because I am bound by <u>Tankleff v.

Senkowski</u>, 135 F.3d 235 (2d Cir. 1998), I deny the petition solely on the grounds set forth in Part

I, and not on the grounds set forth in Part II.  I have considered each of the other grounds for relief

raised in the petition, although they were not pressed by assigned counsel, and have found them to

be without merit.  I grant petitioner a certificate of appealability with respect to the <u>Batson</u> issue.

**SO ORDERED.**

_____

S/

Edward R. Korman
United States Chief District Judge

Dated: Brooklyn, New York
      September 15, 2004

55

**APPENDIX**

People v. Payne, 88 N.Y.2d 172 (1996); People v. Mitchell, 80 N.Y.2d 519 (1992); People v. Bolling, 79 N.Y.2d 317 (1992); People v. Jenkins, 75 N.Y.2d 550 (1990); People v. Scott, 70 N.Y.2d 420 (1987); People v. Carillo, 780 N.Y.S.2d 143 (1st Dept. 2004) (granting new trial); People v. Van Hoesen, 761 N.Y.S.2d 404 (3d Dept. 2003) (new trial); People v. Bhupsingh, 746 N.Y.S.2d 490 (2d Dept. 2002) (reverse-Batson) (new trial); People v. Ramirez, 744 N.Y.S.2d 683 (2d Dept. 2002) (remanding case to trial court for hearing to afford prosecution the opportunity to establish a nonpretextual race-neutral explanation for its challenges); People v. Campos, 736 N.Y.S.2d 108 (2d Dept. 2002) (new trial); People v. Burroughs, 744 N.Y.S.2d 608 (4th Dept. 2002) (new trial); People v. Hymes, 722 N.Y.S.2d 759 (2d Dept. 2001) (remand); People v. Sprague, 721 N.Y.S.2d 205 (4th Dept. 2001) (reverse-Batson) (new trial); People v. Davis, 677 N.Y.S.2d 541 (1st Dept. 1998) (new trial); People v. Cardwell, 680 N.Y.S.2d 598 (2d Dept. 1998) (remand); People v. Guzman, 675 N.Y.S.2d 110 (2d Dept. 1998) (remand); People v. Blancero, 660 N.Y.S.2d 44 (2d Dept. 1997) (new trial); People v. Dalhouse, 658 N.Y.S.2d 408 (2d Dept. 1997) (new trial); People v. Gaines, 655 N.Y.S.2d 62 (2d Dept. 1997) (new trial); People v. Liang Jun Ying, 654 N.Y.S.2d 389 (2d Dept. 1997) (new trial); People v. Starks, 651 N.Y.S.2d 949 (3d Dept. 1996) (remand); People v. Negron, 648 N.Y.S.2d 910 (1st Dept. 1996) (new trial); People v. Wint, 638 N.Y.S.2d 651 (1st Dept. 1996) (remand); People v. Mackenzie, 647 N.Y.S.2d 825 (2d Dept. 1996) (remand); People v. Britt, 647 N.Y.S.2d 527 (2d Dept. 1996) (reverse-Batson) (remand); People v. Jones, 636 N.Y.S.2d 115 (2d Dept. 1996) (new trial); People v. Mack, 632 N.Y.S.2d 798 (2d Dept. 1995) (reverse-Batson) (new trial); People v. Rodriguez, 627 N.Y.S.2d 614 (1st Dept. 1995) (new trial); People v. Jackson, 623

N.Y.S.2d 881 (1st Dept. 1995) (new trial); <u>People v. Garcia</u>, 636 N.Y.S.2d 370 (2d Dept. 1995) (remand); <u>People v. Richie</u>, 635 N.Y.S.2d 263 (2d Dept. 1995) (reverse-<u>Batson</u>) (new trial); <u>People v. Pagano</u>, 616 N.Y.S.2d 366 (1st Dept. 1994) (remand); <u>People v. Williams</u>, 620 N.Y.S.2d 85 (2d Dept. 1994) (new trial); <u>People v. Dixon</u>, 615 N.Y.S.2d 904 (2d Dept. 1994) (reverse-<u>Batson</u>) (new trial); <u>People v. Bennett</u>, 614 N.Y.S.2d 430 (2d Dept. 1994) (new trial); <u>People v. Brown</u>, 597 N.Y.S.2d 434 (2d Dept. 1993) (new trial); <u>People v. Rodney</u>, 596 N.Y.S.2d 169 (2d Dept. 1993) (new trial); <u>People v. Allen</u>, 605 N.Y.S.2d 503 (3d Dept. 1993) (remand); <u>People v. Dabbs</u>, 596 N.Y.S.2d 893 (3rd Dept. 1993) (new trial); <u>People v. Hameed</u>, 584 N.Y.S.2d 94 (2d Dept. 1992) (remand); <u>People v. Lincoln</u>, 587 N.Y.S.2d 870 (4th Dept. 1992) (new trial); <u>People v. Duncan</u>, 582 N.Y.S.2d 847 (4th Dept. 1992) (new trial); <u>People v. Blunt</u>, 574 N.Y.S.2d 812 (2d Dept. 1991) (new trial); <u>People v. Irizarry</u>, 560 N.Y.S.2d 279 (1st Dept. 1990) (new trial); <u>People v. Baker</u>, 558 N.Y.S.2d 44 (1st Dept. 1990) (remand); <u>People v. Reyes</u>, 554 N.Y.S.2d 587 (1st Dept. 1990) (remand); <u>People v. Jenkins</u>, 538 N.Y.S.2d 243 (1st Dept. 1989) (new trial); <u>People v. Miller</u>, 537 N.Y.S.2d 318 (3d Dept. 1989) (indictment dismissed); <u>People v. Harris</u>, 542 N.Y.S.2d 411 (4th Dept. 1989) (new trial); <u>People v. Merritt</u>, 540 N.Y.S.2d 212 (4th Dept. 1989) (remand); <u>People v. Mack</u>, 532 N.Y.S.2d 161 (2d Dept. 1988) (new trial); <u>People v. Mims</u>, 529 N.Y.S.2d 610 (4th Dept. 1988) (remand); <u>People v. Knight</u>, 521 N.Y.S.2d 910 (4th Dept. 1987) (remand); <u>People v. James</u>, 518 N.Y.S.2d 266 (4th Dept. 1987) (remand); <u>People v. Hockett</u>, 512 N.Y.S.2d 679 (1st Dept. 1986) (new trial).